(No. 13194.—Reversed and remanded.)
EMMA BORDNER et al. Appellees, vs. E. E. KELSO et al.
Appellants.

*Opinion filed April 21, 1920—Rehearing denied June 3, 1920.*

1. EVIDENCE—*what must be shown to establish a fiduciary relation.* To establish a fiduciary relation the evidence must disclose a state of facts showing confidence reposed on one side and resulting superiority and influence on the other, and mere proof of the making of a contract or deed is not sufficient.

2. SAME—*when evidence as to customary rate of interest is admissible.* In a suit to set aside a contract for the conveyance of land and a deed executed in pursuance thereof, where the issues are that the contract was unfair and that the grantor was unduly influenced and was not of sufficient mental capacity to engage in the transactions, evidence that the rate of interest on the unpaid balance of the purchase price was the customary rate is competent where the complainants have attacked the rate as unfair.

3. DEEDS—*mental weakness due to old age and disease is not necessarily ground for setting aside deed.* Proof of old age, disease, eccentricity, or even partial impairment of mental faculties, is not necessarily sufficient to set aside a deed, if the grantor has sufficient mental capacity to comprehend the nature of the transaction in making the deed and its meaning and effect and is able to protect his own interests.

4. SAME—*when finding of the chancellor will be set aside.* The Supreme Court will set aside the finding of the chancellor, which is manifestly against the weight of the evidence on the issue of the mental capacity of a grantor, where there is practically no contradiction of any statement of fact upon which the witnesses base their opinions.

5. CONTRACTS—*knowledge of legal phraseology is not a test of mental capacity to contract.* It does not follow that because one does not understand all the legal phraseology of a contract he is therefore incompetent to enter into it.

APPEAL from the Circuit Court of Fulton county; the Hon. G. W. THOMPSON, Judge, presiding.

HARVEY H. ATHERTON, for appellants.

CLAUDE E. CHIPERFIELD, and BURNETT M. CHIPERFIELD, for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

Appellees, heirs-at-law of George W. Bordner, deceased, filed a bill in the circuit court of Fulton county to set aside a contract for the sale of 266 acres of land located in Fulton county to appellant E. E. Kelso by Bordner and a deed made in pursuance thereof. Bordner died intestate March 28, 1919. The contract and deed were made on December 9, 1918. The bill herein was filed July 14, 1919. The grounds alleged in the bill for setting aside the contract and deed were, that the same were procured by fraud and misrepresentation; that the farm was purchased by Kelso at a grossly inadequate consideration; that the grantor was of unsound mind and mentally incompetent to transact business. Under an amendment to the bill, made by leave of court after the evidence was heard, it was charged that a fiduciary relation existed between the deceased and Kelso. A hearing was had before the chancellor, who found that at the time of the making of the contract and deed in question Bordner was not mentally competent to transact ordinary business and that he did not knowingly and understandingly execute the contract and deed, and decreed that the same should be set aside and that the title to the farm vest in the heirs-at-law of Bordner.

George W. Bordner, at the time of the making of the contract and deed, was ninety-three years of age. His eyesight and hearing were so badly affected that it was with difficulty he saw or heard. He owned three farms in Fulton county, which he had accumulated by his own efforts. It is admitted by appellees that up until the last few years he was a man of unusual strength of mind. It appears from the evidence that he desired to sell the land in question and had so desired for some time prior to the date of the contract, and that on the 30th day of September, 1918, he made a contract with E. E. Kelso which stated, in effect, that he had placed the land in the hands of Kelso to be sold by him

"at a price not less than $125 per acre, which is the cost price to said E. E. Kelso, and said E. E. Kelso's commission on said sale will represent the difference between the selling price and the cost price as quoted above." This contract also gave Kelso the exclusive right to sell the property until the first day of September, 1919. It also provided that Kelso was to pay for any improvements that he might make during the time he had the option to sell the farm, and that deceased should not be responsible for any obligation or payment for such improvements. Kelso's commissions were to be made out of the selling price of the farm over and above the sum of $125 per acre. In order that he might realize a greater price than that he was given the right to put improvements on the farm, which the evidence shows he did, but which, however, he was to pay for. Kelso attempted to sell this land to others at $135 per acre but did not succeed in making a sale. There is no contention on the part of appellees that this contract was fraudulently obtained or that it was an unconscionable contract, nor is there any claim that at the time the contract was entered into Bordner was not mentally competent to make it. The only evidence in the record going to that point is the inference drawn from the testimony of some of the appellees' witnesses concerning facts upon which they base their opinion that Bordner was mentally incompetent at the time the contract of sale and deed under discussion were made. There is no further attack made upon the contract concerning the sale of the land by Kelso for the deceased.

On December 9, 1918, Kelso and the deceased entered into a contract of sale of the land to Kelso at the price of $125 per acre. That is the contract in question here. Under the terms of that contract the deceased was to have and retain possession and the income from the land until March 1, 1920, and to pay the taxes thereon up to that time. Kelso was to pay the sum of $5000 on the first day of March, 1920, and the balance on or before the first day

293 — 12

of March, 1925, with interest at the rate of four and a half per cent per annum on the unpaid balance. Kelso covenanted to pay for and put up at least 400 rods of woven-wire fence and to make other repairs and do certain cleaning up about the farm during the year 1919. He was not to secure possession until March, 1920. Kelso by this contract also agreed to keep the buildings insured at his own expense, with a clause in the policy that the loss, if any, should be applied on repairing or re-building the property so damaged or destroyed. The contract also provided that the deed should be put in escrow and not turned over to Kelso until the land had been paid for in full, and provided that in case of failure for a period of sixty days to make any of the payments the contract was to be forfeited and the deed returned to the grantor and all payments made by Kelso and all improvements made by him should be forfeited to the grantor as liquidated damages. Time was made the essence of the contract. Pursuant to this contract a deed was made which was placed in escrow at one of the Lewistown banks. The deed was an ordinary statutory form warranty deed and was signed by deceased and his wife, Emma Bordner. On the 29th day of April, 1919, Kelso sold his interest in the farm to appellant Roy V. Parkinson at an advance of $4490 over the price Kelso was to pay. Parkinson was to carry out all of the terms and conditions of the contract which Kelso had made with the deceased.

The contentions of the appellants are that the chancellor erred concerning the admission of testimony; that the decree is erroneous in finding that Bordner was mentally incompetent to transact business at the time of the making of said contract and deed, and also erroneous in setting aside the contract and deed.

Appellees contend that the contract was made through fraud and misrepresentation. The record contains no evidence whatever of any fraud or misrepresentation nor did the chancellor find there was such, so that such allegations

in the bill may be considered, without further argument, as not having been sustained.

By amendment the bill charged a fiduciary relation existed between Kelso and the deceased. A fiduciary relation is said to exist where confidence is reposed on one side and resulting superiority and influence on the other. (2 Pomeroy's Eq. Jur.—3d ed.—sec. 956.) This relation has been defined by this court in *Mayrand* v. *Mayrand*, 194 Ill. 45, as follows: "The term fiduciary or confidential relation, as used in this connection, is a very broad one. It has been said that it exists and that relief is granted in all cases in which influence has been acquired and abused,—in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist?" The only transactions which this record shows to have occurred between Kelso and deceased were the contracts herein referred to. There is nothing in the record tending to show any other relations between them, except that on one occasion testified to by Whitnah Campbell, son-in-law of the deceased, Kelso, by arrangement with Campbell, endeavored to secure a contract from the deceased for the sale of certain 40 acres of land; that Kelso talked to deceased to get him to make such a contract but that he refused to do so. There is no evidence in the record which in any way fairly tends to establish a trust and confidence on the part of the deceased resulting in superiority or influence on the part of Kelso. The mere fact of the making of this contract does not, of itself, constitute proof of such relation, nor does the option contract of September 30, 1918. These were both contracts made at arm's length. The evidence discloses that the members of the family helped deceased to do those things which he by reason of his loss of sight and hearing found diffi-

cult to do. There is nothing in the record that in any way tends to establish that Kelso had any influence whatever over the deceased. The only evidence in the record showing any more than a business relation between them is the fact that they lived close together, and the testimony of a member of the family that the deceased considered Kelso as a boy and trusted him. The record discloses, however, no circumstances or transactions between them from which an inference of a fiduciary relation could be drawn, and the decree contains no specific finding of such fiduciary relation. We are of the opinion that no such relation existed.

It is also contended that this contract was unconscionable in that the price to be paid was wholly inadequate, and it is pointed out in support of such contention that the land sold, within four months after the making of this contract, for $4490 more than the contract price. Appellees offer the testimony of several witnesses who state that in their judgment the fair cash market value of the land in question at the time of the making of this contract was from $140 to $150 per acre. These witnesses, however, cite no cases of sales having been made in the vicinity of this land. Numerous witnesses for the appellants testified that the land was worth not to exceed from $110 to $125 per acre. It appears that the land lies on the edge of a bluff which leads into the Illinois river bottom and is what is known as broken land, containing washes and gullies, with pasture land and some farm land upon it. The testimony of witnesses both for appellants and appellees shows that subsequent to the date of the contract and deed in question land in that county advanced very materially, numerous witnesses testifying to an advance of from fifty to one hundred per cent in value. We are of the opinion that the evidence in the case does not support the contention of appellees that the price was inadequate, considering the unusual advance in prices of land subsequent to this contract and sale. In addition, it may be said this was the price at which the de-

ceased had previously attempted to sell the land and at which he had given the agency contract to Kelso for the sale of it in September, 1918. If this land was worth from $140 to $150 per acre at the time of making the contract and deed, the fact that the advance in the value of land in that vicinity was as great as the preponderance of the testimony in this record shows it to have been, would indicate that it should have sold for a much more substantial advance than that received in the sale to Parkinson. On the whole, we are convinced that the sum of $4490 can only be said to represent the increase in the market price of the land subsequent to the sale; and we are convinced from the record that the selling price in the contract in question was a fair price. Furthermore, it is evident that had Kelso sold the farm for Bordner instead of buying it himself, he would have been entitled to all of the purchase price over $125 an acre by his contract of September, 1918, which contract is not in any way questioned here. The sale he made to Parkinson was made within the year during which he had the option to sell the farm and to retain as his commission all over the sum of $125 an acre, so that even under that contract he would be entitled to any advance in the price.

Appellees contend, however, that this contract was an unconscionable contract for the reason that Kelso was not required to do anything until March, 1920, while Bordner was to pay the taxes. This is a misconception of the contract. While Bordner was to pay the taxes until March 1, 1920, he was also to receive the income from the farm up to that time. On the other hand, Kelso was required to make numerous improvements during the year 1919, including at least 400 rods of substantial woven-wire fence, and such other improvements as repairing the barn, and repairs of like character. Kelso was also expected to keep up the insurance on the buildings for the benefit of the land in case of damage. We are unable to see anything unfair to the deceased in that feature of the contract.

It is also contended that the rate of interest on the unpaid balance, being four and a half per cent, is evidence of an unfair contract. Appellants sought to introduce evidence to show that four and a half per cent was the usual and customary interest on that class of contracts, which evidence, however, was denied. We think under the issues in this case such testimony was competent. Appellees having attacked this interest as an unfair rate of interest, it was competent for appellants to offer evidence to meet such attack. We are convinced, however, from the evidence offered, that such rate of interest was not an unfair rate of interest in this case. C. W. Harn testified that he had farmed this land for eleven years, and that during those years the deceased had realized a total sum of $12,000 as gross income from the farm. A computation of the amount of interest on the unpaid purchase price as provided in the contract, when compared with this income, shows that the yearly interest would amount to more than the average annual income which the deceased had received from the farm during the last eleven years. This contract also provided, as we have seen, that Kelso was to pay the sum of $5000 on March 1, 1920, but was to receive no deed until the land was paid for in full. The contract was in nowise unconscionable or unfair to the deceased.

It is also contended by appellees that the deceased was mentally incompetent to transact ordinary business at the time the contract and deed were made, and the chancellor found that such was the fact. This is the main contention of appellees. The deceased was ninety-three years of age, and, as we have said, had lost to a large degree his sight and hearing. A number of witnesses testified in general terms as to Bordner's lack of mental capacity, but many of them did not state particular occurrences or transactions upon which they based their opinion. The chief facts testified to as tending to indicate unsoundness of mind were his age, loss of hearing and sight and defective memory;

that he would accuse members of his family of taking money from him; that he frequently cried; that he was obstinate; that he was feeble; that he was at times untidy about his person; that he had to depend upon others to read, write and exchange money for him; that he would mumble to himself or sit and whistle; that at times, on being taken out to his farms to give directions to a tenant, he would forget what he had come to tell him; that at times he did not sustain connected conversation; that he was set in his ways; that at times he did not seem to understand what was said to him and would frequently change the subject of conversation; that he talked frequently of things happening in his youth, and at times arose and dressed at midnight when others were up, thinking it was morning.

It is noticeable in the testimony of all the witnesses for appellees, aside from members of the family of the deceased, who are appellees here, that either the witness had never had any business transactions with the deceased upon which to base his opinion of unsoundness of mind, or where the witness did have such business transactions with him the deceased understood the nature and character of the transactions. The law is that old age, eccentricity, or even partial impairment of mental faculties, is not necessarily sufficient to set aside a deed. The rule is, that if a grantor has sufficient mental capacity to comprehend the nature of the transaction and protect his own interests the deed will not be set aside for want of mental capacity. (*Crosby* v. *Dorward,* 248 Ill. 471; *McLaughlin* v. *McLaughlin,* 241 id. 366; *Baker* v. *Baker,* 239 id. 82; *Sears* v. *Vaughan,* 230 id. 572.) As was said in *Crosby* v. *Dorward, supra,* so it may be said here: "The evidence of some of the witnesses who testified that Crosby was not competent to transact ordinary business is weakened by the fact that they transacted business with him and admitted that he seemed to understand what he was about." ·

The appellees offered eighteen witnesses who gave it as their opinion that the deceased was not mentally competent to transact business. An examination of their testimony discloses that none of them knew of anybody transacting business with deceased in which transaction he was overreached. They all testified that so far as they knew he always transacted his own business. Those who testified at all concerning the matter say that deceased was a man who was not willing to have others do things for him and was not easily influenced. Some, however, testified that in their opinion a shrewd man could take advantage of him. Some of the witnesses testified that there were times when they thought the deceased did not understand the subject of conversation, they, however, saying that they were not sure that he heard what was being said. From the testimony of appellees' witnesses it is evident that the deceased did transact the business of renting his farms, and all other matters which he had to attend to, up to the time of his death, which, in view of the serious handicap of his advanced years and loss of sight and hearing, was an unusual example of mental vitality.

Appellants offered the evidence of twenty-seven witnesses whose testimony tends to establish that deceased was competent to transact business at the time this contract was made. Practically all of these witnesses base their opinions upon business dealings had with him. E. C. Miles, the tax assessor of that township, testified that the year previous to his death deceased without assistance gave him his list of taxable property, both about the house and upon the farms. Russell Fluke testified that on March 10,—which was eighteen days before the death of the deceased,—he called at the home of the deceased for the purpose of making out his income tax schedule. The deceased asked him to wait until his son Henry came. This witness testified that after the arrival of the son the deceased began giving him his report concerning the income from his crops

and relating to the different farms, and that he gave these amounts without assistance as to most of them. Witness states that the son or wife disagreed with the correctness of his statement of items in making out the schedule in but a few instances; that for the most part he gave the items of his income, the source of such items, whether from wheat or other farm produce, and the farm from which it came.

The evidence discloses that nine days after the making of the contract and deed in question the grantor made a deed to his two daughters, appellees Velma Fouts and Irma Campbell, of a life interest in certain land; that he had the deed read over to him; that as first made it was not satisfactory to him, he stating that he wanted the deed so drawn that his daughters would not at any time be without property or income. The deed was re-drawn according to his directions, was executed by him and delivered to the daughters and by them recorded on the date of execution.

This contract and deed were made and executed in the presence of the wife and daughter of the deceased and J. J. McNally, cashier of the Lewistown National Bank, who took the acknowledgment. McNally evidently has no interest in the matter whatever. He clearly details his conversation with the deceased at the time of the making and acknowledging of the contract and deed. He testified that when he went to the home of the deceased he said to him, "Mr. Bordner, you are about to sell a farm?" He said, "Yes, sir; I am getting too old to be bothered with it." The witness replied, "I have a contract and deed here; before you sign these I want to read them over to you." Witness read them over in a loud tone and read them slowly. After he had finished reading them the deceased stated that they were all right. The wife, Emma Bordner, expressed herself as glad that the sale had been made. This witness also testified that as he was about to leave the deceased handed him a check for $1000, saying that it was a Christmas present which he received from his sister, and said, "I do not

have use for it now." Thereupon the witness suggested that he purchase a liberty bond with it, and the deceased asked if they had them up at the bank, to which witness replied that they had, and the deceased thereupon directed witness to put the amount into a liberty bond, which he did.

There is in the record practically no contradiction of any statement of fact on which any witness based his or her opinion concerning the mental capacity of the deceased, the disagreement in the testimony being largely a difference of opinion of the various witnesses concerning that matter. This court is therefore placed in a much better position to weigh the testimony and the opinions of the various witnesses than in cases where there is a sharp controversy in the testimony and where the appearance and presence of the witnesses while testifying are of more importance. While it is the rule that this court will not disturb the findings of the chancellor unless manifestly against the weight of the evidence, yet where such is the condition of the record this court will not hesitate to set such findings aside. *Smith* v. *Kopitzki,* 254 Ill. 498.

We are convinced that the appellees did not sustain the burden placed upon them, as complainants, of making proof of mental incapacity of the grantor. The record shows, as we have seen by the testimony of witnesses on both sides, that all of the transactions in which deceased engaged were carried on by him understandingly and with due regard for his own benefit. While age and disease are proper elements to be considered upon the question of mental capacity to transact business, the mere circumstance that the mental powers have been impaired by age or disease is not, alone, sufficient to invalidate a deed if the grantor fully comprehends its meaning and effect and is able to exercise his will and protect his interest in executing it. We are convinced that the deceased did understand the purport of this contract and deed and that he intended to make them. It does not follow that because one does not understand all the legal

phraseology of a contract he is therefore incompetent to enter into it. Such is not the test of mental competency to contract. Whether or not one understands the meaning of legal phraseology is a matter of education rather than mental competency. We are convinced that deceased knew what his rights were under the contract, and that the deed was not to be turned over to Kelso till the farm was paid for, even though he may not have been able to give the legal definition of the term "escrow."

It is urged by appellants that the family were interested in setting this deed aside for the reason not only that the land had advanced, but that the daughters to whom the deceased had deeded a life estate in certain land were dissatisfied with that deed and had filed a bill to set it aside. In this the appellants are borne out by the statement of these daughters themselves, who say that they are dissatisfied with the deed their father gave them and that they are actively interested in this matter. Likewise, this was the testimony of the husband of one of the daughters, Whitnah Campbell. This motive must be taken in a measure to affect their testimony. It is apparent that all of the members of the family understood about this contract and deed, either at the time or soon after they were made, and that no objection was made thereto during the lifetime of Bordner.

We are convinced that the chancellor was in error in finding that the deceased, George W. Bordner, was mentally incompetent to make the contract and deed in question and in decreeing that the same should be set aside. For this error the decree of the circuit court will be reversed and the cause remanded, with directions to dismiss the bill for want of equity.

*Reversed and remanded, with directions.*