### Charles B. O'Donnell et al., Appellants, v. Snowden & McSweeney Company, Appellee.

1. CONTRACTS—*fiduciary relationship.* In execution of part of gas lease concerning steaming of oil and incidental extraction of gasoline, held that the lessee, an oil company, was not acting in a fiduciary capacity by reason of its superior knowledge of the matter involved.

2. MINES AND MINERALS—*compliance with terms of oil lease as to heating oil.* In action by lessors under oil lease giving royalties of one-eighth for the oil and a less consideration for gasoline incidentally extracted in heating the oil, evidence held to preponderate in favor of defendant's claim that it was not using more heat than was necessary to make the oil merchantable.

3. FRAUD AND DECEIT—*necessity for proving.* Fraud is never presumed but, like any other fact, must be affirmatively shown.

4. CONTRACTS—*disparity in profits as ground for not enforcing.* The mere fact that an oil lease turned out to be more profitable to the lessee than to lessors is no ground for not enforcing it according to its terms.

5. CONTRACTS—*enforcement by courts.* It is the function of courts to enforce lawful contracts and to protect contractual rights, and they will not aid or countenance a disregard of obligations entered into under the same.

6. MINES AND MINERALS—*construction of oil leases.* An oil lease

is not to be construed strictly against the lessee, but is to be construed like any other contract.

7. MINES AND MINERALS—*how oil lease construed as to right to extract gasoline.* An oil lease held to give lessee the right to extract gasoline incidentally released by necessary heating process, and not to limit that right to casing-head gasoline. and fumes escaping from storage tanks.

Appeal by plaintiffs from the Circuit Court of Lawrence county; the Hon. CHARLES H. MILLER, Judge, presiding. Heard in this court at the October term, 1924. Affirmed. Opinion filed February 9, 1925.

SHAW & HUFFMAN and KRAMER, KRAMER & CAMPBELL, for appellants.

GEE & GEE, for appellee.

MR. JUSTICE BOGGS delivered the opinion of the court.

Charles B. O'Donnell, late of Lawrence county, died in 1894, leaving him surviving his widow, Mary O'Donnell, and nine children. Prior to and at the time of his death, said deceased owned, among other lands, the Southeast Quarter of Section Seventeen (17), Town Three (3) North, Range Twelve East, which descended to his widow and heirs.

In 1898, his daughter, Katherine O'Donnell, who had married a man by the name of Harry Milburn, died intestate, leaving no child or children, but leaving her husband, mother, brothers and sisters her surviving. In June, 1906, said widow and the eight surviving children made an oil and gas lease on said premises to Bell & Snowden, which said lease by successive assignments is now held by appellee.

Soon after the execution of said lease drilling was commenced on said premises, and the same were developed until thirty-five producing wells were in operation on said land. In 1912 or 1913 it was discovered that there was gasoline in the fumes and vapors

escaping from the stock tanks and casing heads in the operation of said wells. Thereupon a contract was entered into between the widow and the surviving children of said decedent, and appellee, with reference to the conservation of said gasoline. About this time, the said Harry Milburn, as surviving husband of the said Katherine Milburn, deceased, claimed a one-eighteenth share of all of the oil which had been produced on said lands. In order to settle said claim, appellee procured a conveyance from the said Harry Milburn of said one-eighteenth share in said lands at a cost of something over $10,000. Thereafter, in February, 1914, appellee, in consideration of the making of a new contract with reference to said gasoline, etc., agreed with said widow and surviving heirs to convey to said widow, Mary O'Donnell, said one-eighteenth share in said lands which it had procured from the said Milburn, and in addition thereto to pay $550 per annum as a consideration for said lease, which said lease or contract provided, among other things, as follows:

"Whereas, the said second parties are the owners and holders of a certain lease or grant of all the oil and gas in and under the premises hereinafter described, together with the rights incident thereto, under and by virtue of a certain instrument in writing bearing date the 9th day of June, A. D. 1906, and duly recorded in the proper office of Lawrence County, in the State of Illinois, on the 3rd day of July, A. D. 1906, in volume 11, page 398, wherein the first parties hereto were named as the lessors, and Bell & Snowden of Marion, Indiana, were named as lessees to the premises therein described, being same premises heretofore described.

"And, whereas, the parties of the second part duly entered upon the said premises and are occupying the same in the producing of oil and gas according to the terms and provisions of the said lease or grant; and, whereas, after the said oil is produced and stored in tanks upon said premises it is subjected to a process

of steaming in order to prepare the same for delivery to the Oil Refining Company, by which steaming process an amount of gasoline is freed from the said oil; and, whereas, a certain amount of natural gas escapes from the oil wells on the said premises, currently known as casing-head gas, which is useful for the manufacture of gasoline; and, whereas, the gasoline so as aforesaid freed from the said oil through the said steaming process, as well as the gasoline which may be made from the said casing-head gas would be lost save for the efforts, care, and expenditures of the said parties of the second part in securing, storing, preserving and marketing the same; and, whereas, it is the purpose and intent of the parties hereto to set at rest all doubt and to secure to the said second parties, their heirs, successors and assigns, the right to take, preserve and market for their own use and behoof all such gasoline, whether made from such steaming of the oil or from such casing-head gas, so long as oil or gas is produced from the said land.

"Now, therefore, the said parties of the first part hereby agree and bind themselves, their heirs and assigns, to permit, and that the said second parties, their heirs, successors and assigns, have and shall have the right to lay pipe lines to connect to, and to use and remove the casing-head gas and the gasoline from any and all oil wells and oil tanks on or that may be on the above described premises, so long as oil or gas is produced thereon or therefrom."

The oil derived from said wells was sold to the Indian Refining Company, and said company paid to appellants from time to time, as royalty owing by appellee, one-eighth of the contract price paid for said oil, which said amounts were duly paid until the filing of the bill hereinafter mentioned. Appellee, in addition thereto, paid the rental of $550 per annum under said gas contract, up until about the year 1921, when the lessors refused to accept the same, on the ground, among other things, that crude oil taken from the wells on said premises was being heated to a higher temperature than was necessary to render the oil mer-

chantable, thereby liberating gasoline in larger quantities than was contemplated under said contract.

After the making of said lease and prior to the year 1922, two of the sons died, but their widows and heirs are parties hereto. On April 18, 1922, appellants filed their bill in the circuit court of said county against appellee, alleging among other things that appellee was operating under an oil and gas lease made in June, 1906, by the lessors hereinabove mentioned; that as a part of the business of producing oil under said lease it became necessary to heat the oil by a steaming process in order that impurities might be removed therefrom so as to make said oil merchantable; that by said steaming process some of the volatile properties of the crude oil were freed, escaping in the air and resulting in a waste; that thereafter an agreement was entered into between appellants and appellee, in February, 1914, by virtue of which appellee was given the right to install a plant to save and convert to its own use such volatile gases as had formerly been freed through the said steaming process, which said agreement was set out *in hæc verba.* Said bill further charged that appellee violated said contract agreement, in that it heated the crude oil taken from said premises under said lease to a much higher temperature than was necessary to render said oil marketable, and to a higher temperature than was contemplated by said contract. Said bill prayed for an injunction against the further operation of said steaming plant, etc., and prayed that an accounting might be taken of the profits derived by appellee from the sale of gasoline produced by virtue of said steaming plant, and that appellee be decreed to pay appellants such sum of money as would recompense them for any gasoline that might have been wrongfully taken, and for other and further relief.

An answer was filed by appellee to said bill, denying all the material facts alleged therein, so far as it

was charged that appellee had in any way violated the terms of said contract. Said cause was heard in open court, a finding was made in favor of appellee, and a decree was entered dismissing said bill for want of equity, at appellants' cost. To reverse said decree this appeal is prosecuted.

Counsel for appellants prefaced their argument with the following propositions:

"First. That appellee and its predecessors in title were operating oil properties in Oklahoma, Texas, Arkansas, Kentucky and Illinois, worth $3,000,000.00 and, therefore, thoroughly familiar with the handling of oil; that appellants and their predecessors in title were wholly unfamiliar with the handling of oil.

"Second. That appellants and their predecessors, in the handling of oil from these premises, were necessarily dependent upon appellee and its predecessors to see that they got their fair proportion of the oil produced.

"Third. That there has been extracted during the time in question, from one-eighth of the oil, over 800,000 gallons of gasoline, worth about $80,000.00, for which they have been paid and tendered about $17,300.00.

"Fourth. That the gasoline contract gave the right to make gasoline only from the casing-head gas and from the gas fumes escaping from the storage tanks, while not a gallon of gasoline has been made from the casing-head gas, nor has a gallon of gasoline been made from the gas fumes taken from the storage tanks.

"Fifth. That by the process used by appellee and its predecessors during the time in question, over 6,400,000 gallons of gasoline have been extracted from the oil by this heating process, and it is inconceivable that appellee is correct in its contention that the oil has been heated in a manner and to the extent only that was necessary to prepare it for delivery in the pipe lines and that had the gasoline not been saved it would have been necessary to have given the oil the same heating, thus wasting over $600,000.00 worth of the most valuable properties of the oil."

It will be observed from reading these propositions, and from arguments of counsel following the same, that they are contending that appellee and its predecessors were acting in a fiduciary relation in their dealings with appellants. After a careful search of the record, we are unable to find any support in the evidence for this contention. Said parties, so far as the record discloses, were dealing with each other at arm's length.

In *Bordner v. Kelso*, 293 Ill. 175, the court at page 179, in discussing this question, says:

"A fiduciary relation is said to exist where confidence is reposed on one side and resulting superiority and influence on the other. (2 Pomeroy's Equity Jurisprudence, 3rd ed., sec. 956.) This relation has been defined by this court in *Mayrand v. Mayrand*, 194 Ill. 45, as follows: 'The term fiduciary or confidential relation, as used in this connection, is a very broad one. It has been said that it exists and that relief is granted in all cases in which influence has been acquired and abused,—in which confidence has been reposed and betrayed.' "

In *Bawden v. Taylor*, 254 Ill. 464, the court at page 467 says:

"The facts out of which it is claimed that a confidential relation arose are, that Taylor was the president and general manager of the Taylor Publishing Company, which published The Engineer, and that Bawden was a stockholder in the corporation and a brother-in-law of Taylor. The fact that Taylor was president and Bawden a stockholder did not create a confidential relation. The officers of a corporation are trustees for the stockholders as a body with respect to the business and property of the corporation, which is under their control and management for the benefit of the stockholders generally, but an officer has no control over the shares of the individual stockholder, and is not a trustee for such stockholder with respect to his stock. Officers of a corporation may purchase the stock of stockholders on the same terms and as freely as they might purchase of a stranger. (*Hooker*

*v. Midland Steel Co.,* 215 Ill. 444; Cook on Corporations, 5th ed., sec. 320; 10 Cyc. p. 796.)''

There was no duty shown by this record on the part of appellee or its predecessors to disclose to appellants anything in connection with said gas wells or said gasoline contract, as the record clearly discloses that said parties were fully advised in reference thereto. The contract recites the fact that it was entered into ''to set at rest all doubt and to secure to the said second parties, their heirs, successors and assigns, the right to take, preserve and market for their own use and behoof all such gasoline, whether made from such steaming of the oil or from such casing-head gas, so long as oil or gas is produced from said land.''

In reference to the contention of appellants that appellee was heating the crude oil taken from said wells more than was necessary, and that in so doing it reduced the amount of said merchantable oil, it may be observed that the record discloses that the oil was heated from 160° to 200°. Five expert chemists testified on behalf of appellants to the effect that it was not necessary to heat said crude oil to a temperature of 160° to 200° in order to render said oil merchantable. Some of them testified to the effect that, if allowed to stand, water would settle at the bottom, and that it would not be necessary to have the temperature higher than summer temperature, that is, around 85°. The tests they made were from oil taken from the top of the tank. It is contended on the part of appellee that this was not a reliable test.

On the other hand, a large number of experienced oil men testified that oil of the character taken from appellants' lands, being what is known as Buchanan sand, had to be heated to a temperature of from 185° to 200° in order to remove the water and impurities therefrom. Certain of these witnesses were men who had worked in connection with the wells on said premises, and testified that the gauger who tested the oil for the refining company would not accept the same

and turn it into the pipes until the water and impurities had been removed, and that it required a temperature of from 185° to 200° to accomplish said result. Said witnesses further testified that on several occasions they were required to reheat the oil before said company would accept the same as merchantable.

The evidence in the record clearly preponderates in favor of appellee, to the effect that said oils were not heated more than was necessary to render the same merchantable, and this appellee had a right to do under said lease or contract.

Counsel for appellants do not specifically charge appellee or those through whom it claims with actual fraud. The only allegation in the bill charging fraud is as follows: ''That all of the gasoline that has been taken from the oil produced on said premises has been taken therefrom by the said co-partnership and the said corporation, wrongfully, fraudulently, willfully and knowingly, without any right, title or interest to take the same therefrom in the manner in which it was taken, or to convert the same to their own use.'' There is no evidence in the record to support said allegation. Fraud is never presumed. It must be affirmatively shown, like any other fact. *Bowden v. Bowden,* 75 Ill. 143; *Sawyer v. Nelson,* 160 Ill. 629; *Brady v. Cole,* 164 Ill. 116; *Union Nat. Bank of Chicago v. State Nat. Bank,* 168 Ill. 256.

Counsel refer to the fact that large profits had been derived by appellee and those through whom it claims from the gasoline produced or conserved, subsequent to the execution of said contract. Unless appellee in this connection in some way violated the contract entered into between it and appellants, the mere fact that said contract may have turned out to be more profitable to appellee than to appellants is no ground for not enforcing the same. *Hansen v. Gavin,* 280 Ill. 364-365. It is the function of the courts to enforce lawful contracts and to protect contractual rights, and

they will not aid or countenance a disregard of obligations entered into under the same. *Natural Products Co. v. Dolese & Shepard Co.,* 309 Ill. 230-235; *Crosse v. Supreme Lodge,* 254 Ill. 80-84; *Dime Savings & Trust Co. v. Knapp,* 307 Ill. 432; *Fowler v. Fowler,* 204 Ill. 82.

In *Dime Savings & Trust Co. v. Knapp, supra,* the court at page 441 says:

"A court of equity is equally bound with a court of law to grant appropriate relief in the enforcement of a contract fairly entered into and unobjectionable in any of its features." Citing: *Fowler v. Fowler,* 204 Ill. 82; *Cumberledge v. Brooks,* 235 Ill. 249; *Anderson v. Anderson,* 251 Ill. 415.

It is further contended by counsel for appellants that the contract in this case should be construed strictly as against appellee. There is no merit in this contention. This contract should be construed the same as any other contract. *Chicago Auditorium Ass'n v. Corporation of Fine Arts Bldg.,* 244 Ill. 532. The contract here involved is clear and unambiguous, and, so far as the record discloses, appellee has not been guilty of violating the same in its dealings with appellants. This being true we hold that the court did not err in finding the issues for appellee and dismissing said bill for want of equity.

For the reasons above set forth the finding and decree of the trial court will be affirmed.

*Decree affirmed.*