**COOPER et al. v. OHIO OIL CO.**

**No. 2603.**

District Court, D. Wyoming.

Nov. 12, 1938.

John D. Clark, of Cheyenne, Wyo., for plaintiffs.

A. M. Gee, of Findlay, Ohio, Harold H. Healy, of Casper, Wyo., and C. R. Ellery, of Cheyenne, Wyo., for defendant.

KENNEDY, District Judge.

This is a suit projected on the equity side of the court for an accounting and the recovery of damages alleged to have grown out of the improper operation of oil properties held under lease by the defendant from the plaintiffs, by which operation the defendant fraudulently permitted oil to be drained from the plaintiffs' lands to adjacent lands of other owners on the same structure which the defendant was likewise operating. After preliminary motions to dismiss were ruled against the defendant, an answer was filed controverting the general issues tendered by the bill of complaint together with affirmative defenses involving the application of the Statute of Limitations and the doctrine of laches. The defendant has also made the oft-asserted contention before and throughout the trial that a court of equity had no jurisdiction of the cause.

It would be impracticable in a memorandum of this character to discuss in detail all of the contentions set forth in the pleadings which finally brought the case at issue. Suffice it to say that the bill of complaint purports to set forth a cause of action based upon a lease from the plaintiffs or their predecessors in interest to the defendant, of certain specified oil lands situated in the so-called Rock River Oil Field in the State of Wyoming. It is averred that the lease was executed in October, 1917, for a period of twenty years and that at about the same time the defendant began the development of said lands for oil. It is alleged that in executing said lease the plaintiffs were relying upon the experience, skill, integrity and resources of the defendant to assure the efficient exploitation of the oil and gas resources and to protect the oil and gas therein from drainage. Substantially the terms of the complaint concerning the

protection of the lands from drainage are set forth in the lease, a copy of which is attached to the bill of complaint. It is averred that an oil field was developed by defendant in which through drilling of numerous wells completed in the early periods of the leasehold the defendant acquired knowledge which enabled it to determine with accuracy the more important characteristics of the oil field and especially the fact that the highest part of the structure being an area most susceptible to drainage was within the plaintiffs' lands and that it became the duty of the defendant in order to prevent drainage to drill at least as many wells upon said lands in proportion of their drainage area as it proposed to drill in the remainder of the field. The bill alleges that the defendant acquired leases upon other lands within the producing area of the field and thereby placed itself in a position which was not harmonious with the position of the plaintiffs. It is then stated that at a certain period the defendant concentrated its efforts upon lands other than plaintiffs' lands, leaving the interior of plaintiffs' lands undeveloped within the proven area; that it delayed the drilling of off-set wells which was necessary to prevent drainage; completed twice as many wells upon the lands other than the plaintiffs' lands although said lands contained at least one-half of the area which was productive in the field; produced a great many more barrels of oil from the outside lands than from the plaintiffs' lands although the latter lands contained more recoverable oil than was originally contained in the outside lands, and as a result that 4,000,000 barrels of oil was caused to migrate from plaintiffs' lands to other lands where the defendant produced the same without paying any royalty thereon to the plaintiffs, thereby making for itself a profit by saving the cost of drilling and operating additional wells on plaintiffs' lands. The bill states that in this respect the defendant acted fraudulently and in reckless disregard of the rights of the plaintiffs and of the confidence and trust imposed in it by them and in violation of its covenant in the lease to use due care to see that oil and gas in plaintiffs' lands were produced from wells within the limits thereof and was not drained away through wells on neighboring lands. The plaintiffs then plead that until less than three years before the commencement of the action the plaintiffs had no knowledge that the de-

velopment program of the defendant was contrary to the accepted practice in the petroleum industry and had no knowledge that any drainage of oil was occurring, as the plaintiffs were relying upon the good faith and skill of the defendant that it would act and was acting in a prudent and customary manner to protect said lands and ultimately to produce the original oil contained therein. Further, that drainage had occurred first came to the knowledge of the plaintiffs in the year 1935 and that they then caused an investigation to be made from which the misconduct and fraudulent action of the defendant and the violation of its covenant to protect the plaintiffs' lands from drainage first came to their knowledge upon which they immediately made demand upon the defendant for an accounting and settlement, which defendant has refused to make. The prayer is that an accounting be had of the losses suffered by the plaintiffs on account of the wrongful and fraudulent acts of the defendant and for its failure to perform its obligations under the lease, and the plaintiffs be awarded judgment against the defendant for the oil originally contained in the plaintiffs' lands but drained away by the defendant through wells on neighboring lands.

The trial of the case consumed a period of nearly three weeks in which the evidence consisted of documents, records, logs, maps, reports and correspondence between the parties and their agents, together with the introduction of drill cores, and principally the testimony of a large number of expert geologists and petroleum engineers who expounded their various theories and doctrines to the extent that there was danger of both Court and counsel becoming lost in the labyrinth of technical theory and expression. No attempt will be made to outline even in condensed form a running sketch of this testimony. A brief mention of the high spots of the controversy as revealed by the evidence must suffice for the purposes of this memorandum in considering the principal points involved. Counsel have been most helpful in supplying the Court with exhaustive briefs.

The original discovery in the field was made upon plaintiffs' lands and following this wells were drilled around the presumed exterior lines of the structure to determine its area. In some places water was encountered. Other wells were from time to time drilled upon plaintiffs' acreage

and likewise upon the acreage of adjacent lands also operated by the defendant. At the time off-set wells were drilled upon the Cooper lands and in some instances it would seem that the off-set wells upon plaintiffs' lands preceded those upon the adjacent lands. The program of the defendant seemed to follow the ordinary course of development until sometime about the year 1922, when what is known as well No. 10, upon the S.E.¼ of Section 35, T. 20, R. 78, was brought in as a gas well. The opening of this well according to the records immediately affected the flow of other wells on the Cooper lands within the immediate area which resulted in shutting in the well and in the determination of the defendant to drill no more wells on the crestal area, where it was previously supposed that the content was oil and not gas. This was followed by the drilling of other wells on the Cooper areas, perhaps largely of an off-set character. The evidence shows that from 7,000,000 to 8,000,000 barrels of oil was produced from the plaintiffs' lands and about 10,000,000 barrels from the wells on the other lands within the structure.

The theory of plaintiffs' geologists and engineers is, that by the failure to develop the interior of plaintiffs' lands in adequate form the oil therein was drained to adjacent lands, this theory being based upon a two-fold operation of nature, to wit: The development and spread of a secondary gas cap upon the apex of the structure which with the drilling of wells farther down the flanks, pushed or caused the oil content to recede to the lower contours and therefore into the adjacent lands, and that at a certain intermediate and indeterminate period the movement was taken up by gravity drainage, which two operating agencies caused the disappearance of oil in plaintiffs' lands to the adjacent areas, with a resultant loss to the plaintiffs. On the other hand, it is the theory of the defendant's geologists and engineers that the gas cap at the crest of the structure was an original gas cap in which there was little or no oil content and that the continued drilling in that area would not only produce no oil but would tend to reduce the recovery of oil upon plaintiffs' lands farther down the slopes, together with the firmly maintained belief that there was, nor could there be little or any damage sustained by a force designated as gravity drainage, except within a very limited area of no consequence in solving the issues in this case. In addition, the defendant offered testimony of many experienced oil operators and drillers, including geologists and petroleum engineers, to the effect that under the existing circumstances and the science known to the industry at the time the operations on plaintiffs' lands were conducted, the development was carried on in the customary and approved manner.

As has been stated at the outset, the question as to whether this case is brought within the equity jurisdiction of a Federal Court had been accentuated and reiterated by counsel for defendant from the inception of the suit and it would therefore seem to justify some discussion. This Court felt from the beginning that there might be a serious question as to its jurisdiction in equity, but giving the plaintiffs the greatest latitude possible in the so-called discrepancy in pleading, it was thought that the proofs upon the trial might clarify the situation. As before intimated, the complaint seems to base the equitable jurisdiction upon somewhat of a three-fold nature: (1) The accounting; (2) the alleged fiduciary relationship existing between the the plaintiffs and the defendant; and (3) the alleged fraud practiced upon the plaintiffs by the defendant. While some suggestion is made that there may be a permissible interchange of prosecution of a suit either at law or in equity and a possible transfer when the Court finally reaches a conclusion on the point presented, from the law side to the equitable side or vice versa, and while the new rules attempt in a measure to abolish the distinction between law and equity (this being of doubtful significance because this suit was brought and submitted before the new rules went into effect), yet it is evident that neither the rules nor the decisions of the Federal courts have attempted to abolish or diminish the statutory provision found in 28 U.S.C.A. § 384, which reads: "Suits in equity shall not be sustained in any court of the United States in any case where a plain, adequate, and complete remedy may be had at law."

This statute in effect is no different from the general rule which has prevailed in American Jurisprudence in providing in a general way that suits for damages are properly placed on the law side of the court for the reason that they are triable to a jury. This thought is amplified in the

Federal courts because of the constitutional provision that in suits of this class where the value in controversy exceeds twenty dollars, the right of trial by jury shall be preserved. U.S.Const.Amend. 7. The importance of this point in the case is therefore significant.

Analyzing the complaint in its larger sense, the suit would seem to be one for the recovery of damages sustained by the plaintiffs on account of a breach of covenant contained in the contract between plaintiffs and the defendant, to wit: The failure to prevent the drainage of oil and gas from plaintiffs' lands to adjacent lands through the improper methods used by the defendant in developing the oil field. Classified strictly upon this analysis, it would appear to be nothing more or less than a suit to recover damages sustained on account of the breach of a covenant between the parties. What is added by plaintiffs is an accounting feature, the declaration of a fiduciary relationship and the alleged fraud practiced. These allegations according to the decisions do not necessarily convert a law case into an equity suit. The inhibition of the Federal Statutes and the general rule is, that suits in equity shall not be maintained where a plain, adequate and complete remedy may be had at law. Numerous cases have been cited as to when allegations of accounting, fiduciary relationship and fraud confer jurisdiction upon a court of equity where no adequate remedy exists at law. A type of the court decisions explaining this general proposition of law is a case tried in this court which later went to the Circuit Court of Appeals of the Eighth Circuit while our District was embraced therein. Investors' Guaranty Corporation v. Luikart, 5 F.2d 793. Some of the points involved here are discussed in that decision. As to an accounting, the decision reads, at page 796:

"Equity jurisdiction for an accounting is quite generally based on one of three grounds, viz.: (1) Need of a discovery; (2) complicated character of accounts; (3) existence of fiduciary or trust relationship. The rule is clearly stated, 1 C.J. p. 633, § 98, as follows: 'The bill or complaint must take a case calling for the exercise of the peculiar powers of a court of equity; that is to say, it must show either that no legal remedy exists, or that the legal remedy is not complete, or is not as efficient and practicable as the remedy in equity, as that a discovery is necessary, or that the accounts are mutual or complicated, or that a fiduciary relation exists between the parties.' London Guarantee & Accident Co., Ltd., v. Bell Telephone Co. of Buffalo (C.C.) 171 F. 278; Butler Bros. Shoe Co. v. United States Rubber Co., 156 F. 1, 84 C.C.A. 167.

"While the jurisdiction of equity as to accounting has been much enlarged, and is generally concurrent with courts of law, not every controversy as to accounting is cognizable in equity. The mere existence of an account or the claim for accounting does not of itself confer jurisdiction in equity to the exclusion of law. Each particular case must be determined by the facts peculiar to it, having in mind the adequacy or inadequacy of the remedy at law."

As to the question of fraud, at page 797: "As to the question of fraud, upon which plaintiff bases claim to equitable jurisdiction, it may be said that, if there is a plain, speedy and adequate remedy at law, there is no concurrent jurisdiction in equity, and the courts have quite generally held that where a money recovery only is sought, and the amount can be recovered in a law action, the ground of fraud will not be sufficient in itself to maintain a bill in equity, nor will it be where the fraud as a defense at law can be pleaded in complete relief. 21 C.J. p. 109; Buzard v. Houston, 119 U.S. 347, 352, 7 S.Ct. 249, 30 L.Ed. 451; Manchester Fire Assur. Co. v. Stockton Combined Harvester & Agricultural Works (C.C.) 38 F. 378."

The rules there laid down appear to be amply supported by the cited authority. In the case at bar, the complaint itself and certainly the proofs indicate that the ordinary accounting characteristic is not present. No discovery was asked, for the reason that all progress in the exploitation of the oil field was continuously given to the plaintiffs, their agents and their attorneys, not only by specific reports but by access of the plaintiffs to all field operations and all books of record in the office of the defendant. The accounts are all on one side. The proofs used by the plaintiffs were largely the reports furnished and records, logs and data gained by the plaintiffs from their access to the office records of the defendant. The proofs of damage were predicated upon the acts of the defendant as to the development program which must have been in the hands of the plaintiffs long before the suit was institut-

ed. The demands of the complaint were made as definite and concrete as possible from computations of plaintiffs' witnesses and when the proofs of the plaintiffs were complete it became simply a matter of determining whether the damage claimed had been sustained by competent and substantial proof.

As to the allegations of fraud, they seem to be of no greater significance than the alleged existence of a failure on the part of the defendant to carry out and fulfill the covenant in its contract with the plaintiffs to protect plaintiffs' lands from drainage. As to the allegation of any fiduciary relationship existing between plaintiffs and defendant, this might also be similarly classified as being no more than the breach of covenant on the part of the lessee defendant in failing to protect the land against drainage. Counsel for plaintiffs cite no case in which it has been held under similar circumstances that the relationship between the lessor and the lessee in his oil lease constitutes what is commonly known in law as a fiduciary relationship, a trust or a joint adventure. One of the cases cited, Lonabaugh v. Midwest Refining Co., 285 F. 63, a decision by this Court, carries with it a much different element of trust relationship than appears in the case at bar. Plaintiffs' counsel seems to express a hope that this Court may perhaps be interested in becoming the pioneer in converting the ordinary gas and oil lease contract into a trust relationship, if it does not already exist. This Court, however, being doubtful of its soundness, has no desire to enter upon an ambitious program along the line suggested.

Among the many cases cited by the defendant and selected here as a type to illustrate the general line of authorities is O'Donnell v. Snowden & McSweeny Co., 318 Ill. 374, 149 N.E. 253, and is to the effect that a fiduciary relationship or a trust does not exist between the lessor and lessee in an ordinary oil and gas lease. At page 255 of 149 N.E., the Court says:

"Much of appellants' brief is devoted to an argument based on the assumption that a fiduciary relation existed between the parties to the supplemental agreement of 1914 and that appellee overreached appellants in making the agreement. There is no relation of special trust or confidence between the lessor and lessee in a gas or oil lease any more than in any other. Colgan v. Forest Oil Co., 194 Pa. 234, 45 A. 119, 75 Am.St.Rep. 695. Like all other contracting parties, they deal at arm's length, each for his own interest. The mere act of making the contract does not constitute proof of a fiduciary relation. Bordner v. Kelso, 293 Ill. 175, 127 N.E. 337. * * *

"A contract between parties dealing in oil and gas is, of course, subject to the same rules of interpretation as any other contract. Hammett Oil Co. v. Gypsy Oil Co., 95 Okl. 235, 218 P. 501, [34 A.L.R. 275]. The contract must be construed as a whole, and the intention of the parties collected from the entire instrument, and not from some detached portion. Wolf v. Blackwell Oil & Gas Co., 77 Okl. 81, 186 P. 484; Chicago Home for Girls v. Carr, 300 Ill. 478, 133 N.E. 344."

The statement here made is but typical of many other State and Federal courts. The relationship between lessor and lessee does not satisfy the test as to the existence of a trust and clearly should not be classified as a joint adventure because of the absence of necessary elements; such as, the sharing of profits and losses, cooperation in carrying on the enterprise or a voice in the control of operations. Chisholm v. Gilmer, 4 Cir., 81 F.2d 120.

Having examined the complaint and heard the proofs in this case, the Court has become satisfied that its jurisdiction in equity is extremely doubtful because of the absence of those predominating features which must be the basis of equitable jurisdiction in Federal courts, and the point must accordingly be ruled against the plaintiffs.

Should counsel, however, be successful in establishing through the higher courts his somewhat advanced theory in regard to fiduciary relationship, trust or joint adventure as being applicable to the case at bar, it might be wise for this Court to discuss some of the other points raised. A controversial question which both plaintiffs and defendant thoroughly recognize as being present in the case, is the possible application of the Statute of Limitations or Laches to the position of the defendant. Just how far the recent decision of the Supreme Court in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188, 114 A.L.R. 1487, should apply in suits of this character may still be a matter in the realm of dispute. It would seem from an examination of the Wyoming Statute that if the suit had been brought in the State Court it would have been

governed by the provisions of Section 89-411, W.R.S., which reads: *"Trespass, replevin and fraud.* Within four years, an action for trespass upon real property, an action for the recovery of personal property, or for taking, detaining or injuring the same, but in an action for the wrongful taking of personal property the cause of action shall not be deemed to have accrued until the wrong doer is discovered; an action for an injury to the rights of the plaintiff, not arising on contract, and not hereinafter enumerated; and action for relief on the ground of fraud; but the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud."

■ The rule of laches in courts of equity whether controlled by State statutes or otherwise, is not greatly different in effect, at least to the extent that after a fraud has been discovered, reasonably prompt action must be predicated thereon or the complaining party will be held to have been guilty of laches. It is likewise the rule laid down by many decisions that laches will follow the law of limitations, except there is some extraordinary reason why it should not be invoked. The plaintiffs have recognized the significance of the statute and the rule by attempting at least to plead around the long period of delay in the commencement of the suit by asserting the discovery of the alleged fraud within the period of three years immediately prior to its institution. The allegations of the bill in this particular are somewhat meagre in the matter of setting forth the discovery of the fraud, how it was discovered and the facts incidental to the reason why it was not discovered before, in the exercise of ordinary diligence. Assuming that the pleading in itself is sufficient, what of the proofs in attempting to sustain the bill in this respect? The contract between the parties seems to have been drawn with the idea in mind of affording the plaintiffs at all times the ultimate detail in the matter of discovery and operation in the field. Not only this, but the evidence shows that through arrangements between the parties the reports, including all data concerning the location and drilling of the wells, were furnished by the defendant from time to time to plaintiffs' agents and attorneys. The office of the defendant was open to the inspection of plaintiffs for a study of the records there maintained by the defendant in regard to its operations. Reports seem to have been furnished in duplicate so that one copy might be and was sent to the solicitors of the plaintiffs in England. Under arrangement between the parties the reports and data were given to Mr. Corthell, the attorney for the plaintiffs and a resident of Laramie, Wyoming, which is reasonably near the oil field in controversy. For a time at least the office of the defendant was maintained in Laramie and the records of that office voluntarily made accessible to study by plaintiffs, their agents and attorneys. Further, it appears that the plaintiffs did employ at their own expense and with their own choice, two different geologists or petroleum engineers who made extensive examinations of the field and the operations therein, together with a study of the history as recorded by the defendant Company in its location and drilling program. These examinations and studies were made in the comparatively early history of the field during the time that it is now claimed the major portion of the damage from drainage was being accomplished. The reports of these experts employed by the plaintiffs seem generally to have approved the course of conduct pursued by the defendant in exploiting the field. Some of the plaintiffs themselves from time to time during the course of the exploitation visited the field and saw the operations which were being carried on in regard to the development of the plaintiff's lands. There was certainly no concealment by the defendant of its operations. These acts on the part of the plaintiffs looking to the protection of their interests occurred during the entire period of developing the oil field and the early efforts were carried on at a period at least twelve to fifteen years before the institution of this suit. Certainly all that plaintiffs have learned in later years concerning the development of the field were known then, excepting perhaps as to the new theory of drainage which has been expounded by plaintiffs' recently employed geologists and engineers. This newly discovered theory of secondary gas cap and gravity drainage is not to be classified as knowledge recently discovered, in the light of the real physical facts that everything from which such a theory could have been developed was in the possession of the plaintiffs at all times.

Types of cases which control this situation are found as United States v. Christopher, 10 Cir., 71 F.2d 764, where Judge Bratton at page 765 says: "Plaintiff seeks

invoke that rule by alleging that the fraud was concealed and not discovered until in June, 1928. The effort must fail for two reasons. First, it is necessary in a case of this kind to plead specifically and with reasonable certainty the manner in which the fraud was effected, the steps taken to achieve secrecy, or the self-concealing nature of the fraudulent scheme. The amended bill fails to do that. It is merely alleged in general terms that the facts were concealed and that the government, as well as its officers and agents, were kept in ignorance. Neither the manner in which that was done, the steps taken to effect the result, nor the self-concealing nature of the method, is set forth even in a fragmentary way. The pleading fails to meet this well-recognized requirement of law."

And again, Standard Oil Co. of Colorado v. Standard Oil Co., 10 Cir., 72 F.2d 524, where Judge Phillips in a note to his opinion on page 527, lays down the following rule: "Knowledge of facts and circumstances which would put a person of ordinary prudence on inquiry is, in the eyes of the law, equivalent to knowledge of all the facts which a reasonably diligent inquiry would disclose. Wood v. Carpenter, 101 U.S. 135, 141, 25 L.Ed. 807; Johnston v. Standard Min. Co., 148 U.S. 360, 370, 13 S.Ct. 585, 37 L.Ed. 480; Jewell v. Trilby Mines Co. (C.C.A. 8) 229 F. 98, 102."

And again, Percy v. Cockrill, 8 Cir., 53 F. 872, where the late Judge Walter H. Sanborn at page 875 says:

"The rule that length of time is no bar in equity to a suit for relief from an actual fraud or a constructive trust, clearly proved, which has been fraudulently and successfully concealed from the party aggrieved, has no application to this case subsequent to 1858. One of the qualifications of this rule is that the facts constituting the fraud or trust must have been fraudulently and successfully concealed from the injured party. Badger v. Badger, 2 Wall. 87, 92 [17 L.Ed. 836]. And notice of facts and circumstances which would put a man of ordinary intelligence and prudence on inquiry is, in the eye of the law, equivalent to knowledge of all the facts a reasonably diligent inquiry would disclose. 'Whatever is notice enough to excite attention, and put the party on his guard, and call for inquiry, is notice of everything to which such inquiry might have led. Where a person has sufficient information to lead him to a fact, he shall be deemed conversant with it.' Kennedy v. Green, 3 Mylne & K. 699, 722; Wood v. Carpenter, 101 U.S. 135, 141 [25 L.Ed. 807]; Rugan v. Sabin (decided by this court December 6, 1892) 53 F. 415; Parker v. Kuhn, 21 Neb. 413, 421–426, 32 N.W. 74 [59 Am.Rep. 838]; Wright v. Davis, 28 Neb. 479, 483, 44 N.W. 490 [26 Am.St. Rep. 347]. * * *

"In cases of concurrent jurisdiction the federal courts, sitting in equity, consider themselves bound by the statutes of limitations which govern courts of law in like cases, and this rather in obedience to the statutes rather than by analogy. In many other cases they act upon the analogy of the statutory limitations at law. Generally courts of equity act, or refuse to act, in analogy to the statute, and they will not be moved to set aside a fraudulent transaction, or to enforce a constructive trust, at the suit of one who has been quiescent during a period longer than that fixed by the statute of limitations, after the complainant had knowledge of the fraud or trust, or after he was put upon inquiry, with the means of knowledge accessible to him. Wagner v. Baird, 7 How. 234, 257 [12 L.Ed. 681]; Godden v. Kimmell, 99 U.S. 201, 210 [25 L.Ed. 431]; Burke v. Smith, 16 Wall. 390, 400 [21 L.Ed. 361]; Kirby v. Railroad Co., 120 U.S. 130, 7 S. Ct. 430 [30 L.Ed. 569]; Boone County v. Burlington & M. R. R. Co., 139 U.S. 684, 692, 11 S.Ct. 687 [35 L.Ed. 319]."

As this court views the situation in the light of these authorities, it would seem to appear that the plaintiffs were in the early period of development of the field when drainage is claimed to have taken place, in possession of all physical facts which would have led them in the exercise of ordinary diligence to have taken whatever steps were necessary to protect their lands from the drainage complained of. There is no evidence of bad faith on the part of defendant, except as it is sought to be inferred from the physical manner in which the field was developed. This analysis of the situation inevitably leads to the conclusion that the plaintiffs, if the theory of fraud be entertained, are met with the Wyoming Statute of Limitations, or if this should not control, then by the inexorable rules of laches, and it must so be ruled.

Up to this point the Court has not touched upon what would seem to be the

real merits of the controversy. During the early stages of the trial the Court remembers hazarding the thought that the chief point in controversy was, as to whether or not the defendant had operated the lease in a manner generally known and approved in the industry, and it still suggests itself as the most important point in the case. The tempest rages around the controversial point as to whether or not it was incumbent upon the defendant to drill up the interior of the Cooper lands under the circumstances and conditions there found to exist, with a highly potent gas well being brought in on the crest of the structure. It may be admitted that as a general rule an oil acreage is drilled upon the basis of a certain number of wells per quarter section, but this does not necessarily carry with it the obligation of an operator to drill in this general way irrespective of lessons taught in the general operation of the field, if they lead to the reasonable conclusion that such drilling would not produce effective and profitable results. The divergence of opinion between the experts of plaintiffs and defendant seem to be on the one hand, that the crestal area was originally filled with oil and on the other hand that it was originally filled with gas. If there were an original gas cap with no oil content the drilling of wells in that area would exhaust the gas and thereby the energy which operated the wells farther down upon the contours where oil was present. If the crestal structure was filled with oil instead of gas it would be apparent that this oil should properly be recovered by the drilling of wells. As a matter of fact, no one definitely knows, even the experts themselves, as to what the exact condition was many hundreds of feet under the ground in the crestal portion of that structure. Plaintiffs' experts attempt the development of one theory and defendant's experts another theory. At least the greater number of experts testifying upon this subject seem to approve the theory of the defendant in not drilling intensively within the interior of the structure on plaintiffs' lands. In addition, many experienced oil operators actually in charge of the development of oil fields throughout the Western country sustain the contention of defendant that the field was developed in a manner that an experienced operator of ordinary prudence would have operated, having regard for the interest of both lessor and lessee and considering the circumstances then present and the then knowledge the industry. It is difficult to discou the testimony of experienced oil operato upon the proposed theory of plaintif counsel that they are simply testifying b cause of a supposed fellowship which ex ists among oil operators. At least ther is no evidence in the record justifying such a conclusion.

Closely akin to this phase of the controversy is the question as to whether or not the drainage as contended for by plaintiffs took place or at least as to whether the evidence along this line was sufficiently developed to amount to a preponderance upon the point. Here again the experts were in hopeless confusion and disagreement. As before stated, the theory of plaintiffs' experts was that the drainage was caused through the forming of a secondary gas cap in the crestal portion of the structure after oil began to be removed from the wells on the lower contours, coupled with the theory that some time in the interim gravity drainage took up the burden and disposed of the rest of the oil in plaintiffs' lands into those lower down. In regard to the idea of the formation of any secondary gas cap which would cause serious drainage, the defendant's experts regarded it as rather a new and doubtful theory, but they were nevertheless apparently not much concerned with a theory which in their opinion was applied to a non-existent physical factor. Under defendant's theory the gas cap was original and not secondary and consequently there could be no drainage of a substantial nature brought about by any expanding secondary gas cap. The theory of gravity drainage and its effectiveness as an agent was advanced whole-heartedly by none of the experts on either side except plaintiffs' witness Lewis, and yet we find that this element entered into his calculations in establishing the amount of oil alleged to have been drained from plaintiffs' lands. Again, in the first instance it would appear that plaintiffs' experts had not examined into the effective force of a water drive upon the structure from the outlying and lower areas but reserved the privilege of testifying upon this subject after having heard the defendant's testimony in regard to its effect upon the contents of the structure here involved. I cannot believe that it can be said upon a review of the entire evidence in the case that the plaintiffs' testimony established by a preponderance

of the evidence that the field was not operated in a manner known to and approved by the industry or that there actually had been a drainage of oil from the plaintiffs' lands to those adjacent.

This leaves for final consideration (in the event the Court should be mistaken as to proofs being insufficient to establish improper methods of development and drainage) the measure of damages offered by plaintiffs as the basis for recovery in this suit. The calculation is made up by the use of curves, charts, graphs and logarithms, which to say the least are somewhat mystifying to the Court who may readily admit being a pronounced "layman" in the realm of oil field exploitation and higher mathematics. Any deficiency of this character on the part of the Court, however, should not necessarily condemn the process. It would seem that the rather ingenious method involved the assumption that, taking the north end of the field with an imaginary line drawn from east to west, and assuming that the lands of the plaintiffs and other adjacent lands in the field carried an equal amount of oil, that a conclusion could be arrived at of the loss by drainage by a comparison of the amount of oil produced on the plaintiffs' lands with that produced on the comparable adjacent lands of the structure. By this method involving logarithmic deductions, one of the experts of plaintiffs deduced the figures equivalent to a 5,000,000 barrel loss and computing the royalties of plaintiffs through the various years in applying the varying prices of oil to the prescribed royalties arrived at the conclusion that the loss in dollars and cents amounted to approximately $1,100,000. His companion expert, however, approximated the loss in barrels at 3,500,000. This may have been accounted for by reason of the fact that the latter expert did not adopt in whole-souled fashion the theory indulged by the computant as to-the effect of gravity drainage. Again, the first expert in rebuttal after having considered the evidence of defendant in regard to the effect of the water drive upon the drainage theory seemed to concede that some allowance should be made for this element, but without the adoption of any definite formula by which this newly considered agency would diminish the loss by drainage theretofore ascertained, was willing to make a lump cut of $100,000, from his previous ascertained damages. This "juggling" of large figures leaves the judicial mind in a hazy state of uncertainty. It is true that Judge Phillips holds in Hoffer Oil Corporation v. Carpenter, 10 Cir., 34 F.2d 589, that a reasonable basis for computation and the best evidence which is obtainable under the circumstances of the case and which will enable the jury to arrive at an approximate estimate of the loss, is sufficient. The proofs in this case, however, scarcely rise to the dignity of this principle so far as furnishing an approximate estimate of the loss is concerned. It is elementary of course, needing no citation of authority, that courts will not guess money out of the pockets of one party into those of another. The proofs are of such a character in this case concerning the damages sustained in dollars and cents that it is felt no just conclusion with any degree of certainty could be reached upon which to predicate a judgment in plaintiffs' favor.

Not all the points which have been presented have been discussed in this memorandum, as it is already out of proportion in length for a trial court decision, but enough has been said we hope to outline the general views which the Court holds upon the more important and controlling features of the case as affording a basis for the necessary findings and conclusions.

The final decision must be in favor of the defendant and against the plaintiffs, and appropriate findings, conclusions and a judgment may be presented by counsel for defendant in collaboration with their opponent within twenty days of the date of this momorandum providing for the dismissal of plaintiffs' bill of complaint, with costs, and reserving all desired exceptions to plaintiffs.