679 F.2d 815
 WILLIAMS PETROLEUM COMPANY, a partnership composed of
William H. Clement and H. C. Preston, Jr.,
Plaintiff-Appellant,
v.
MIDLAND COOPERATIVES, INC., Hudson Oil Company, Inc., and
Hudson Refining Company, Inc., Defendants-Appellees.
 No. 80-1227.
 United States Court of Appeals,
Tenth Circuit.
 June 1, 1982.
 
 John Lampton Belt, Oklahoma City, Okl., for plaintiff-appellant.
 Rita Page Reuss, Minneapolis, Minn. (Donald L. Worthington of Fitzgerald, Houston & Worthington, Stillwater, Okl., with her on the brief), for defendant-appellee Midland Cooperatives, Inc.
 George W. Dahnke, Oklahoma City, Okl., for defendants-appellees Hudson Oil Co., Inc. and Hudson Refining Co., Inc.
 Before DOYLE and LOGAN, Circuit Judges, and TEMPLAR, District Judge.*
 LOGAN, Circuit Judge.
 
 
 1
 In this diversity action Williams Petroleum Company ("Williams") appeals from the trial court's grant of summary judgment in favor of defendants Midland Cooperatives, Inc. ("Midland"), and its successors in interest, Hudson Oil Company, Inc. and Hudson Refining Company, Inc. (collectively "Hudson"). This is the second time Midland and Williams have been before this Court on issues arising out of a finder's fee contract they entered into in 1973. In the earlier appeal, we affirmed a ruling that Williams was entitled to a finder's fee on royalty oil Midland was receiving under a 1973 contract with the government. See Williams Petroleum Co. v. Midland Coops., Inc., 539 F.2d 694 (10th Cir. 1976). In this second appeal Williams claims it is entitled to additional money from Midland and its successor Hudson (1) as postjudgment interest on finder's fees paid late to Williams on oil Midland received under the 1973 contract, and (2) as finder's fees earned on royalty oil Midland and Hudson received pursuant to 1976 and 1977 contracts with the government (A) because those contracts were renewals, extensions, or novations of the 1973 contract between Midland and the government, and therefore come within the terms of the court's original order that we affirmed, or (B) because the oil Midland and Hudson received was from the same source of supply Williams had found for Midland.
 
 
 2
 Midland entered into the finder's fee agreement with Williams in February 1973 after it experienced severe shortages of crude oil that forced its refinery to shut down for several weeks. If successful, Williams was to receive a $.05 per barrel finder's fee "for so long as that particular supply shall be made available to (Midland) or its assignees."
 
 
 3
 Shortly after signing the finder's fee contract, Williams told Midland it had undertaken efforts on behalf of Midland to secure crude oil from the federal government pursuant to the Outer Continental Shelf Lands Act, ch. 345, § 5, 67 Stat. 464 (1953) (current version at 43 U.S.C. § 1334). This Act authorizes the Secretary of the Interior to lease Continental Shelf lands and to sell royalty oil accruing or reserved to the United States. Midland directed Williams to discontinue these efforts because Midland considered the federal royalty oil program a previously-known source of supply, and on March 6 it terminated its contract with Williams. Shortly thereafter, Midland applied to the same government program for royalty oil, and on July 13, 1973, the government accepted Midland's application and signed an agreement to provide 11,080 barrels of oil per day (Contract I).
 
 
 4
 Williams then filed suit against Midland, seeking $.05 for each barrel Midland was receiving from the government. On July 24, 1975, the trial court entered summary judgment for Williams. On August 6, 1975, the court determined how much oil Midland had received thus far from the royalty program and ordered Midland to pay Williams $319,122.17 as the finder's fee on oil Midland received through July 24 and $18,808.98 in prejudgment interest, with those sums to accrue 10% postjudgment interest until paid. The order also provided that Midland was to pay $.05 per barrel on oil received after July 24 pursuant to Contract I "or any renewals or extensions or novations thereof." Midland appealed the court's order. We affirmed, holding that Williams had found a new source of oil within the contemplation of the finder's agreement. Williams Petroleum Co. v. Midland Coops., Inc., 539 F.2d 694 (10th Cir. 1976).
 
 
 5
 Midland continued to purchase oil under the Outer Continental Shelf Lands Act after Contract I expired June 30, 1976.[1] On July 26, 1976, Midland and the government entered into a contract for crude oil to run from August 1, 1976 to July 1, 1979 (Contract II). On January 31, 1977, Hudson purchased Midland's refinery. Because Contract II did not permit assignment, the government cancelled it and immediately entered into another agreement directly with Hudson. (Contract III). When Contract III expired on June 30, 1977, Hudson reapplied and obtained a new two-year contract. (Contract IV).
 
 
 6
 Meanwhile, in January 1977 Williams and Midland entered into a stipulation-and-tender agreement in which Midland acknowledged liability and tendered to Williams $524,003.05 (which included the amounts the court previously had ordered paid) for royalty oil delivered to Midland prior to June 30, 1976. The parties expressly stipulated that liability for oil delivered after June 30, 1976, was reserved for future judicial determination or for judicial enforcement pursuant to the court's prior judgment. The parties also reserved for future resolution Williams's claim of $13,279.49 as interest due on finder's fees Midland had owed Williams for oil Midland received after the court's 1975 order and prior to the June 30, 1976 termination of Contract I. In 1979 the parties asked the trial court to decide the two issues they had reserved for future resolution. After a short hearing, the trial court granted summary judgment in favor of Midland and Hudson on all issues, holding that Williams was not entitled to any postjudgment interest on oil Midland received between July 24, 1975 and June 30, 1976; further, that Contracts II, III, and IV were not renewals, extensions, or novations of Contract I, and that Williams was not entitled to any more money from either Midland or Hudson "by reason of the finder's fee contract of February 8, 1973." From that judgment Williams appeals.
 
 
 7
 * Williams contends Midland owes postjudgment interest on the finder's fees due Williams because of royalty oil Midland received between the date of the trial court's judgment on July 24, 1975, and the June 30, 1976 termination of Contract I. The parties stipulated that this additional interest, if owed, is $13,279.49. In diversity suits, unless the parties have otherwise agreed, state law determines the right to interest on a judgment. Woodmont, Inc. v. Daniels, 290 F.2d 186, 187 (10th Cir. 1961). In Oklahoma, "(a)ll judgments of courts of record except the Workers' Compensation Court shall bear interest at the rate of twelve percent (12%) per year ...." 12 Okla.Stat.Ann. § 727 (Supp.1981).[2] Previously Oklahoma courts have applied this statute to money judgments, e.g., State v. Berry, 495 P.2d 401, 403-04 (Okla.1972); Missouri-Kansas-Texas R.R. v. Edwards, 401 P.2d 303, 306 (Okla.1961); M.E. Trapp Associated v. Tankersley, 240 P.2d 1091, 1094 (Okla.1952), and to alimony decrees requiring one party to pay fixed amounts in installments, e.g., Harden v. Harden, 191 Okla. 698, 130 P.2d 311, 314 (Okla.1942); Stanfield v. Stanfield, 67 Okla. 56, 168 P. 912, 914 (1917).
 
 
 8
 The court's order of August 6, 1975 settled the exact amount owing for all deliveries through July 24, and expressly ordered postjudgment interest on that sum until paid. The next paragraph, exactly repeating the July 24 order, directed Midland to pay Williams $.05 per barrel on all royalty oil received from the government program under Contract I, "which said sum shall be payable simultaneously and in a like manner with payments made by the defendant to the United States of America." Because Contract I provided for delivery of 11,080 barrels per day, Midland knew how much oil it would receive under all usual circumstances,[3] and, therefore, how much it would have to pay Williams in finder's fees. Because the court's order stated that Midland was to pay Williams simultaneously with paying the government for its royalty oil, Midland knew when those payments were to be made.
 
 
 9
 We find the court's order essentially analogous to an alimony decree, in which one party is required to make monthly payments of a fixed amount. Because the trial court's 1975 order required Midland to make those payments, Williams was entitled to postjudgment interest when Midland failed to comply. Therefore, we hold the trial court erred in rejecting Williams's claim for $13,279.49 in postjudgment interest.
 
 II
 
 10
 Williams contends the court erred in concluding that Midland and Hudson did not owe Williams finder's fees for oil they obtained from the government's royalty oil program by virtue of Contracts II, III, and IV. Williams argues, first, that Contracts II, III, and IV were extensions, renewals, or novations of Contract I. It argues, second, that even if the later contracts were not extensions, renewals, or novations, the finder's fee agreement applied so long as Midland received oil from the source found by Williams, which it alleges was the government's royalty oil program.
 
 
 11
 * Novation is the replacement of an unexpired contract by another contract reached through renegotiation, or the substitution of a new party with the concurrent release of an original party from liability. State v. Pitts, 197 Okla. 644, 173 P.2d 923, 925 (1946). Clearly Contract II was not a novation of Contract I. Renewal and extension are concepts closely allied to one another, normally involving a continuation of the relationship on essentially the same terms and conditions as the original contract. See Seymour v. Coughlin Co., 609 F.2d 346, 350-51 (9th Cir. 1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1980); East Bay Union of Machinists, Local 1304 v. Fibreboard Paper Prods. Corp., 285 F.Supp. 282, 287 (N.D.Cal.1968), aff'd mem., 435 F.2d 556 (9th Cir. 1970); Mutual Paper Co. v. Hoague-Sprague Corp., 297 Mass. 294, 8 N.E.2d 802, 806 (1937); Sunac Petroleum Corp. v. Parkes, 416 S.W.2d 798, 802-03 (Tex.1967). Contract II was not a renewal or extension since it differed from Contract I in several important ways. Contract I provided for 11,080 barrels per day of crude oil derived from two locations, the West Delta and Main Pass Areas. The oil derived from these two locations was sweet crude oil, a high quality crude having a low sulfur content, for which Midland paid approximately $5.25 per barrel. Contract II provided for 3,706 barrels per day between August 1, 1976, and July 1, 1977, and only 1,853 barrels per day between July 1, 1977, and July 1, 1979, when it was to terminate. Under Contract II, Midland received sour crude oil, a lower quality oil with a high sulfur content, from the Eugene Island area, and paid approximately $11.00 per barrel. We agree with the trial court's ruling that Contract II was not an extension, renewal, or novation of Contract I. Since the link to Contract I was broken, we need not consider Williams' arguments that Contract III was a novation of Contract II and Contract IV a renewal of Contract III.
 
 B
 
 12
 Williams's second argument is that the finder's fee agreement was a "source" contract entitling Williams to $.05 per barrel on all oil delivered to Midland or its successor Hudson from the source identified by Williams, which it alleges was the government's oil royalty program. Midland contends the trial court's first order restricted the finder's fee to Contract I and any renewal, extension, or novation thereof. We do not believe the trial court's first order was intended to determine the scope of the finder's fee agreement because, at that time, only Contract I was in existence and whether the finder's fee agreement would apply to other contracts was not at issue. In its original complaint, although Williams referred to "sources of supply" and alleged it was entitled to a fee on all crude oil "made available to the defendant through the Government Royalty Oil Program," Williams clearly sought relief only for oil Midland was receiving under Contract I. We find nothing in the record to suggest that before the first appeal to this Court, the trial court considered Williams' right to royalties under any later contract Midland might enter into, although the court did order Midland to pay Williams its finder's fee for oil delivered pursuant to Contract I "or any renewals or extensions or novations thereof." This Court's affirming opinion, as originally entered, restated the trial court's order as applying to "any oil received by Midland in the future resulting from its participation in the federal royalty oil program." When Midland promptly objected that we inadvertently had broadened the trial court's order, we amended our opinion by substituting nearly the exact language used by the trial court. In so doing, over Williams's objection, we tacitly accepted Midland's contention.
 
 
 13
 However, we believe that the trial court's second order did determine the scope of the finder's fee agreement. After we affirmed the trial court's first order, the parties asked the trial court to determine whether Midland and Hudson owed Williams any money for oil delivered after June 30, 1976. Through motions and documents filed with the court, and through oral argument, all parties clearly raised whether the finder's fee contract applied to all purchases from the royalty oil program, as well as whether the later contracts were renewals, extensions, or novations of Contract I. Since a court may try issues presented by the parties even though they are not within the pleadings, the issue of the scope of the finder's fee contract was properly before the trial court. The trial court's order granting summary judgment in favor of Midland and Hudson states that nothing more is owed to Williams "by reason of the finder's fee contract of February 8, 1973." Implicit in this conclusion is that the finder's fee agreement did not apply to subsequent contracts for royalty oil.
 
 
 14
 The problem we have is with the trial court's having disposed of the issue on summary judgment. At the hearing held on the parties' contentions, the trial court did not comment on Williams's claim to a finder's fee for any oil Midland and Hudson received from the oil royalty program. At the oral argument the trial judge stated only that he was "satisfied that Midland has paid in full the judgment that I entered and I'm ready to do whatever is necessary to make that a judgment of this Court." The court's summary judgment contains only the conclusory statement that nothing more is due under the finder's fee contract. Without any indication of the court's reasoning, we must review the finder's fee contract and the record to see if Midland and Hudson were entitled to summary judgment, which is proper only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 15
 The finder's fee contract is a letter agreement written on Midland's stationery, providing specifically that if Williams locates a "new source of supply" and Midland enters into an agreement with that source either while Williams is its consultant or within one year thereafter, Williams is entitled to its $.05 per barrel fee "for as long as that particular supply shall be made available to this company or its assigns even though it may be through exchange(s)." The agreement requires that the crude oil procured be "sweet," with sour crude acceptable only for exchange. It also provides for termination by either party upon sixty days written notice, a right Midland exercised. If terminated, the agreement has no effect except that for crude oil contracts Midland has already entered into with a source furnished it by Williams (and apparently for contracts Midland enters into with such a source within one year after Williams furnished Midland that source), the agreement declares Midland must tender the finder's fee "for the period of the contract agreement."[4]
 
 
 16
 We cannot say that this agreement is so clear on its face, or so clear when read in the context of the stipulations, documents, and depositions in the record, that summary judgment was appropriate. We cannot say whether the parties intended "new source of supply" to refer to a particular contract Midland might enter into, such as Contract I, or more broadly to general sources of supply, such as the entire offshore federal royalty oil program. Affidavits and documents in the record show that before entering into the agreement with Williams, Midland had inquired about the availability of federal royalty oil. Midland asserts Williams knew about these inquiries. If true, this evidence would suggest that the parties did not intend "new source of supply" to refer to the entire federal royalty program. Furthermore, simply from the documents in the record, we cannot determine how the interpretation of "source" might be affected by language in the finder's fee agreement that, following termination, limits the finder's fee to "the period of the contract agreement." We are also unsure whether it is relevant that Contract II provided for sour crude, while the finder's fee agreement declares that sour crude is acceptable only for exchange. Additionally, one of the parties granted summary judgment, Midland, apparently drafted the finder's fee agreement and would be subject to the rule that ambiguities are to be resolved against the drafter. See Williams Petroleum, 539 F.2d at 697.
 
 
 17
 The record suggests both parties were prepared to present additional evidence as to the coverage of the finder's fee agreement, evidence the trial court should have heard. We hold, therefore, that on this issue summary judgment was improper. We reverse and remand, with directions that the court should consider all relevant evidence the parties present and should make specific findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).
 
 
 18
 REVERSED AND REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable George Templar, Senior Judge of the United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 Although Contract I was to terminate in February 1976, Midland and the government extended that contract until June 30, 1976
 
 
 [2]
 When the trial court issued its order on July 24, 1975, the statute provided for a 10% interest rate
 
 
 [3]
 Contract I did permit the government to curtail deliveries under extraordinary circumstances either because of inadequate supplies or national emergency
 
 
 [4]
 The full text of the agreement is as follows:
 "This letter confirms our agreement whereby your firm, Williams Petroleum Company, Burkburnett, Texas, may act in a capacity as an independent crude oil purchasing consultant for this company or its assignees. It is understood that your firm may not commit this company to any agreements without the written consent of this company. This company reserves the right to refuse any agreement which does not meet quality or pricing compatible to our supply requirements. Also, that the relationship between Williams Petroleum Company and this company is strictly contractual and that Williams Petroleum Company is not nor has it ever been affiliated with this company except to the extent this letter agreement certifies.
 "It is further understood crude oil that Williams Petroleum Company shall find and assist in contractually securing and delivering to our Cushing Refinery shall be covered by this letter agreement. The quality of the crude oil must be merchantable and sweet. Sour crude obtained for purpose of exchange for sweet will be accepted only upon and based on the volume of sweet crude oil delivered at Cushing.
 "It is understood that when Williams Petroleum Company notifies this company in writing of a reasonable source of supply which may be made available to this refinery either directly or through some exchange program then Williams Petroleum Company shall have an exclusive right to pursue that source for a period of time to be deemed reasonable and as long as Williams is prudent and diligent in its efforts. The object of this portion of this agreement is to allow Williams to pursue one or possibly two reasonable sources of supply at one time and is not intended to give Williams an exclusive or blanket right to pursue all sources of supply at once.
 "It is understood that Williams Petroleum Company shall be paid by this company a Finder's Fee of $.05 per bbl for the quantity of crude oil Williams shall procure and deliver to the Cushing Refinery for as long as that particular supply shall be made available to this company or its assignees even though it may be through exchange(s). In the event that Williams furnishes a new source of supply and no contractual arrangements are consumated (sic) then in that event if this company shall enter into a contractual relationship for crude oil within one year (1) with that new source of supply then Williams Petroleum Company shall receive its finder's fee as provided for in this agreement. This stipulation shall not apply to supply sources historically used by this company.
 "This company will furnish Williams necessary information needed for prospective suppliers. Also, it will be this company's responsibility to make all financial arrangements with the prospective supplier.
 "It is further understood that this agreement may be terminated by either party upon 60 days written notice by either party and shall not be of any force and effect except to the extent that new crude oil contracted during the period of effectiveness of this agreement this company will continue to tender to Williams in cash the $.05 per bbl finder's fee for the period of the contract agreement."