Paul F. SAWYER, Plaintiff,

v.

Michael T. GUTHRIE, individually, and d/b/a MTG Operating Company; Express Acquisition Company, a Delaware Corporation, formerly known as 1993 Offshore Limited Partnership, a Delaware Limited Partnership; Torch Energy Advisors Incorporated, a Delaware Corporation; Torch Acquisition Company, a Delaware Corporation; Mission Resources Corporation, a Delaware Corporation, formerly known as TEAI Oil & Gas Company, a Delaware Corporation, Defendants.

No. 01–CV–170–B.

United States District Court, D. Wyoming.

Aug. 2, 2002.

Kate M. Fox, Nancy D. Freudenthal, Davis & Cannon, Cheyenne, WY, Peter A. Bjork, Robert Charles Mathes, Darin

Boyd Scheer, Bjork, Lindley, Danielson & Little, Denver, CO, for Plaintiff.

Weston W. Reeves, Reeves & Miller Park Street Law Office, Casper, WY, Randall T. Cox, Gillette, WY, Mark W. Gifford, Casper, WY, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

This case arises out of various oil and gas leases, subleases, and farmout agreements between the parties, as well as the royalties arising thereon. The case is now before this Court on Plaintiff's Motion for Partial Summary Judgment, Defendant Guthrie's Motion for Summary Judgment, and Defendants Mission Resources, Torch Acquisition Co., Torch Energy Advisor and Express Acquisition's Motion for Summary Judgment. After reading the briefs, hearing oral argument, and being fully advised on the premises, the Court **FINDS** and **ORDERS** as follows:

### Parties and Jurisdiction

Plaintiff Paul F. Sawyer is an individual domiciled in Bailey's Harbor, Wisconsin. Plaintiff owns several oil and gas leasehold interests in Campbell County, Wyoming. Defendant Michael T. Guthrie ("Guthrie") resides in Mississippi and Florida. Guthrie is the sole proprietor of MTG Operating Company, which does business in Mississippi and Wyoming. Defendant Express Acquisition Company ("Express") is a Delaware corporation with its principal place of business in Texas. Express was formerly known as 1993 Offshore Limited Partnership. Defendant Torch Energy Advisors Incorporated ("Torch Energy") is a Delaware corporation with its principal place of business in Texas. Defendant Torch Energy has conducted business in Wyoming individually and through Defendant Express with re-gard to the real and other property interests located in Campbell County. Defendant Torch Acquisition Company ("Torch Acquisition") is a Delaware corporation with its principal place of business in Texas. As the corporate parent of Defendant Express, Torch Acquisition has conducted business in Wyoming with regard to the real and other property interests located in Campbell County. Defendant Mission Resources Corporation ("Mission") is a Delaware corporation formerly known as TEAI Oil & Gas Company ("TEAI"). Mission has conducted business in Wyoming as TEAI and by and through Torch Energy with regard to the real and other property interests located in Campbell County which are the subject of this action.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000, exclusive of interests and costs, and the matter is between parties who are citizens of different states. Venue is proper pursuant to 28 U.S.C. § 1391.

### Background

On August 1, 1990, Jack F. Overstreet obtained two oil and gas leases (the "1990 Leases") from the Lynde Trust ("Lynde Lease") and the Stuarts ("Stuart Lease") which granted interests in approximately 2,745 acres located in Townships 47 and 48 North, Range 72 West, Campbell County, Wyoming. Each of the 1990 Leases had an initial term of approximately five years, with the Lynde Lease to expire on August 1, 1995 and the Stuart Lease to expire on February 1, 1996—unless the leases were held by production in accordance with their terms.

Overstreet assigned 100% of the working interest in the 1990 Leases to Plaintiff Sawyer on August 1, 1990. On December 3, 1991, Plaintiff entered into an Option

Farmout Agreement with American Oil and Gas Corporation ("AOG") for the 1990 leases ("AOG Farmout"). This agreement was to expire on December 31, 1993, but the parties renegotiated the date so that the agreement would not expire until December 31, 1994. Prior to this expiration date, AOG drilled fifteen producing gas wells.

On July 22, 1992, Plaintiff assigned ("1992 Assignment") 100% of his interest in the shallow rights portion ("Shallow Rights") (surface to 2,000 feet below the surface) of the 1990 leases to AOG, subject to the terms of the AOG Farmout, and with retention of a 5% overriding royalty[1] in the Shallow Rights and retaining all rights to the lands below 2,000 feet ("Deep Rights"). Through a series of assignments in March of 1994, AOG assigned 100% of their interest in the 1990 Leases to Defendant Guthrie. Guthrie assigned 66.6666667% of his working interest in both producing and non-producing properties under the 1990 Leases to 1993 Offshore Limited Partnership. On December 31, 1994, 1993 Offshore Limited Partnership merged into Defendant Express.

With regard to the land included in the 1990 Leases, Plaintiff entered into a Farmout ("Express Farmout") agreement with Defendants Guthrie and Express on May 19, 1995. Between May 1, 1995 and August 1, 1996, five wells were permitted and four wells were drilled by Torch Operating Company on lands covered by the 1990 Leases. Defendant Guthrie was a minority working interest owner in all four wells until he sold his interest to Koch Exploration in August, 1996. Plaintiff continues to receive royalties on these wells.

On February 8, 1996, the Stuart Lease expired without any wells having been drilled. The Lynde Lease expired on August 1, 1996 as to all lands not then included in producing or shut-in well spacing units or unitized areas ("non-producing acres") which encompassed approximately 2,000 acres of the original 2,745 acres covered by the 1990 Leases. Nineteen producing wells on approximately 745 acres continue to provide Plaintiff with income. Of these nineteen wells, fifteen are AOG wells and four are Torch wells. Plaintiff retains his rights under the terms of the 1990 Leases to the approximately 745 acres upon which the nineteen producing wells exist.

On October 7, 1996, the Lynde Trust leased some of the lands originally covered in the 1990 Leases together with other lands that had not been the subject of the 1990 Leases to Overstreet ("1996 Lynde Lease"). The total acreage covered by this lease was 3,664. In mid-October 1996, the Stuart family leased lands that had previously comprised a portion of the 1990 Leases, together with other land which had not been the subject of the 1990 Leases, to Overstreet ("1996 Stuart Lease"). Subsequently, Overstreet assigned the 1996 Stuart and Lynde Leases (collectively "1996 Leases") to Guthrie. Since acquiring the 1996 Leases, Defendant Guthrie has drilled 43 wells upon land which was included in both the 1990 Leases and the 1996 Leases, resulting in substantial production.

▪ Plaintiff claims that some or all of the Defendants failed to preserve or timely reassign interests obtained in the 1990 Leases as required in the subsequent

---

**1.** An overriding royalty is an interest severed out of the working interest or lessee's share of. the oil, free of the expenses of development, operation, and production. The duration of the overriding royalty is limited to the life of the lease from which it was created. *See* 2 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW § 418 (1991)(hereinafter Williams & Meyers).

agreements and that in relation to the 1996 Leases, Defendant Guthrie participated in a washout transaction[2] in order to destroy Plaintiff's overriding royalty interest in the 1990 Leases. Plaintiff contends that he is entitled to royalties from wells on the 1996 Leases, which rest upon land which was subject to the 1990 Leases, pursuant to the extensions and renewals clause contained in the 1990 Leases which reserved his overriding royalty interest.

Plaintiff claims that he first discovered that he had been washed out of the 1990 Leases when he traveled to Wyoming from his home in Wisconsin and saw that new wells were operating on land which had been the subject of the 1990 Leases, but from which he was not receiving royalties. Plaintiff claims that since he was still receiving royalties from other wells on the 1990 Leases, he had no reason to believe that he was being cheated on other producing wells.

Plaintiff brings the following claims: 1) against Defendants Guthrie and Express for breach of contract, as they had agreed, pursuant to the 1992 Assignment, AOG Farmout, and Express Farmout to preserve Plaintiff's shallow rights and not cause a termination of the 1990 Leases by failing to comply with the terms of the 1990 Leases, including not actively drilling and thus allowing the lease to expire as to non-producing wells; 2) breach of good faith and fair dealing against Defendants Guthrie and Express because the 1992 Assignment, AOG Farmout, and Express Farmout have implied duties of good faith and fair dealing, and they breached these duties to Plaintiff by failing to establish production in paying quantities or continuously prosecute drilling and/or reworking operations as required by the 1990 Leas-

es—which constitutes actions which are inconsistent with the agreed-upon common purpose and the justified expectations of Plaintiff; 3) breach of fiduciary duty as to Defendant Guthrie in that the AOG Farmout was a joint business relation, Defendant Guthrie succeeded to AOG's interests and obligations under the Express Farmout, and Guthrie expressly agreed that he would not cause the termination of the 1990 Leases by failing to comply with their terms (i.e. not continuing to drill). Plaintiff alleges that Guthrie had a duty of utmost good faith due to the relationship which arose from the joint venture, and Guthrie was forbidden from using that knowledge or interest to prevent Plaintiff from receiving payment from the venture. Plaintiff claims that Guthrie participated in conduct designed to extinguish Plaintiff's interests so that Guthrie could obtain those interests for himself, which constitutes a washout transaction; 4) quiet title under Wyo.Stat. 1–32–202 *et seq.* providing that in an action to recover real property, it is sufficient where Plaintiff's petition states that he has legal estate in and is entitled to possession of the real property, while describing the same with sufficient certainty so that an officer can identify it and Defendant keeps him out of possession unlawfully—as to Plaintiff's 5% royalty in the 2,745 acre mineral estate described in the 1990 Leases; 5) conversion against Defendant Guthrie, as Plaintiff has a 5% overriding royalty interest in the 2,745 acres described in the 1990 Leases, and Guthrie has converted it to his own use in a manner which denied Plaintiff a right to use and enjoy such interest; 6) unjust enrichment against Defendant Guthrie for the above taking of the 5% overriding royalty; 7) constructive trust as to the 1996

---

**2.** The intentional termination of a lease to destroy a nonoperating interest is a washout tactic. A washout is conduct by an operator designed to extinguish the overriding royalty interest while at the same time preserving the operator's interest. *See* 2 Williams & Meyers, § 420.2, at 356.2(7).

Leases—requesting that since Guthrie is being unjustly enriched by the above conduct, the Court should impose a constructive trust on the subject lands so that Plaintiff can obtain his 5% overriding royalty; 8) declaratory judgment as to the parties' rights under the various contracts, and as to whether the 1992 Assignment which states "the overriding royalty and all other terms and conditions of the 1992 assignment shall apply to any and all extension, renewal, and substitute leases obtained by AOG, its successors and assigns on the relevant land" applies to the 1996 Leases obtained by Guthrie, thereby entitling Plaintiff to that 5% in the 1996 Leases; 9) "joint and several alter ego theory" as Defendant Torch Acquisition is the corporate parent of Defendant Express and conducts or has conducted its business by and through its subsidiary Express; Express conducts or has conducted business as Torch Energy; Torch Energy conducts or has conducted business as TEAI; all of TEAI's assets and obligations were acquired by Mission Resources; and Express, Torch Acquisition, Torch Energy, and TEAI have had substantially the same officers and directors and are mere instrumentalities of each other.

Plaintiff moves for partial summary judgment, requesting that the Court determine that: 1) Defendants had a duty of good faith and fair dealing and an express contractual obligation to not cause termination of the 1990 Leases; 2) Defendants breached their duty of good faith and fair dealing and express contractual obligation to not cause termination by failing to preserve or reassign the 1990 Leases; 3) Defendant Guthrie had a heightened obligation to recognize Plaintiff's 5% overriding royalty interest in all extension, renewal and substitute leases on the lands originally covered by the 1990 Leases; and 4) Defendant Guthrie breached this heightened obligation by failing to recognize Plaintiff's overriding royalty interest as the 1996 Leases constituted an extension or renewal as to the land originally covered by the 1990 Leases.

Defendant Guthrie and Defendants Express Acquisition Company, Torch Energy Advisors Incorporated, Torch Acquisition Company and Mission Resources Corporation (hereinafter "Torch Defendants") moved for Summary Judgment as to Plaintiff's Amended Complaint, as the Plaintiff's claims are based entirely upon undisputed contracts between the parties which may be disposed of as a matter of law by the Court and that no material issues of fact exist regarding the application of the terms of the contracts.

### *Discussion*

### *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jenkins v. Wood,* 81 F.3d 988, 990 (10th Cir.1996) (quoting Fed.R.Civ.P. 56(c)). The court views the evidence in the light most favorable to the party opposing summary judgment. *Jenkins,* 81 F.3d at 990.

The party moving for summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the nonmoving party's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to establish the existence of an essential element of the claims on which they bear the burden of proof at trial. *Id.* And "[w]hile the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not ne-

gate the nonmovant's claim." *Jenkins*, 81 F.3d at 990.

To satisfy this burden, the nonmoving party must go beyond the pleadings and designate specific facts to make a showing that there is a genuine issue for trial. *Ford v. West*, 222 F.3d 767, 774 (10th Cir.2000) (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir.1998)). In order to successfully resist summary judgment, there must be sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir.1997).

### I. *Breach of Contract*

A Federal Court sitting in diversity "must ascertain and apply state law to reach the result the Wyoming Supreme Court would reach if faced with the same question." *Carden v. Kelly*, 175 F.Supp.2d 1318, 1322 (D.Wyo.2001). Oil and gas contracts and leases should be treated under doctrines of contract law. *Moncrief v. Williston Basin Interstate Pipeline Co.*, 880 F.Supp. 1495, 1514 (D.Wyo.1995), rev'd on other grounds, 174 F.3d 1150 (10th Cir.1999); *State v. Moncrief*, 720 P.2d 470 (Wyo.1986). Under Wyoming law, the purpose of contract interpretation is to determine the true intention and understanding of the parties. *State v. Pennzoil*, 752 P.2d 975, 978 (Wyo.1988); *Amoco Production Co. v. Stauffer Chemical Co. of Wyoming*, 612 P.2d 463, 465 (Wyo.1980). If the contract is in writing and its language is clear and unambiguous, intent is determined solely from the contract lan-

guage. *Id.* The existence of an ambiguity as well as the interpretation and construction of a contract is a matter of law for the court. *Id.*

An ambiguous contract is one which is "obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present." *Bulis v. Wells*, 565 P.2d 487, 490 (Wyo.1977). The contract as a whole should be considered, taking into consideration the relationship between the various parts. *Moncrief v. Louisiana Land and Exploration Co.*, 861 P.2d 516, 526 (Wyo.1993) citing *Cliff & Co. v. Anderson*, 777 P.2d 595, 598 (Wyo.1989). In determining whether or not there is any ambiguity which would justify an examination of extrinsic evidence, the court must look to the language of the document itself. *Pennzoil*, 752 P.2d at 978. The fact that the parties may subsequently disagree concerning the contract's meaning does not establish an ambiguity which would require resort to extrinsic evidence. *Cliff*, 777 P.2d at 599.

A court must avoid construing a contract so as to render one of its provisions meaningless, since each provision is presumed to have a purpose. *Wyoming Game and Fish Commission v. Mills Co.*, 701 P.2d 819, 822 (Wyo.1985). If reasonably possible, a court must avoid a construction of a contract leading to a conclusion that inconsistent provisions exist. *Shepard v. Top Hat Land & Cattle Co.*, 560 P.2d 730, 732 (Wyo.1977). In giving effect to the contracting parties' intent as expressed in the language of their written contract, a court should abide by the rule that common sense and good faith are the leading characteristics of contract construction. *Wangler v. Federer*, 714 P.2d 1209, 1213 (Wyo.1986). The language of the parties expressed in their contract must be given effect in accordance with the meaning which that language would

convey to reasonable persons at the time and place of its use. *Klutznick v. Thulin,* 814 P.2d 1267, 1271 (Wyo.1991).

■ Plaintiff brings a claim against Defendants Guthrie and Express for a breach of contract, as they had allegedly agreed, pursuant to the 1992 Assignment, AOG Farmout, and Express Farmout to preserve Plaintiff's shallow rights and not cause a termination of the 1990 Lease by failing to comply with the terms of that lease. Plaintiff claims that the breach of contract occurred due to a failure to continue actively drilling and thus allowing the lease to expire as to non-producing lands. The Court finds no merit in this argument.

The language primarily relied upon by the Plaintiff for his breach of contract claim is contained in the AOG Farmout at paragraph Nine and the Express Farmout at II, which states in applicable part: that Defendants expressly agree that they "shall not cause a termination of the Lease, or any portion thereof, through failure to comply with the terms of the Lease, including but not limited to paragraph 3 thereof." *See* Exhibit B and Exhibit E to Plaintiff's Amended Complaint. Paragraph Three of the Lease refers to the duty to pay royalties from drilling. *See* Exhibit A to Plaintiff's Amended Complaint. Plaintiff alleges that Defendants "caused" a termination of the Lease by failing to drill and thereby preserve Plaintiff's interest in the Leased lands which constitutes a breach of Defendants' contractual duty not to "cause" a termination. According to the plain terms of the Farmout Agreements, the only thing which Defendants contracted to do was to not cause a termination of the Lease *through failure to comply with the terms of the Lease.* By the express and unambiguous terms of the Lease, the Lease terminated automatically at a set date as to any area which was not being continuously drilled. Therefore, the true cause of the termination of the Lease as to the non-producing areas was the mere passage of time, a specifically negotiated material term which the parties included in the Lease. No contractual duty existed which would require Defendants to continuously drill on every area of the Lease, and thereby not allow the Lease to terminate naturally by its own terms.

Additionally, Plaintiff himself did not have any duty to continuously develop the Lease lands, as the Lease specifically stated that it was a "paid-up lease" and that "Lessor agrees that Lessee shall not be obligated ... to commence or continue any operations during the primary term." *See* Pltf's Exhibit A to Amended Complaint at Paragraph 4. Therefore, Plaintiff cannot claim that a failure to develop caused a breach in this manner either. The Lease expressly enumerates numerous duties, such as the duty to pay royalties, the duty to comply with Federal and state laws, the duty to not drill within 200 feet of the house or barn without prior permission, the duty to take precautions to protect livestock and the duty to prevent substantial drainage—but the Lease does not enumerate a duty to continuously drill so that no part of the Lease be allowed to expire naturally, according to its terms. For the Court to imply any meaning into the language of the Farmout Agreements other than what they actually state would controvert Wyoming law regarding the interpretation of unambiguous contractual language, which the Court refuses to do.[3]

---

**3.** Plaintiff also argues that Guthrie breached the 1992 Assignment, the AOG Farmout and the Express Farmout by failing to pay Plaintiff a royalty on the 1996 leases pursuant to the Assignment and Renewals clause. However, this part of the Complaint will be disposed of in a subsequent section in which the Court discusses the 1996 Leases and the Assignment and Renewals clause.

After an examination of the express language of the contracts, no genuine issues of material fact remain. Therefore, Defendants' Motions for Summary Judgment as to the breach of contract claims are **GRANTED** and Count One of Plaintiff's Amended Complaint is **HEREBY DISMISSED**.

## II. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff brings Count Two of his Amended Complaint against Defendants Guthrie and Express alleging that the 1992 Assignment, AOG Farmout, and Express Farmout have implied duties of good faith and fair dealing, and that Defendants breached these duties to Plaintiff by failing to establish production in paying quantities or continuously prosecute drilling and/or reworking operations as required by the 1990 Leases—which constitutes actions which are inconsistent with the agreed-upon common purpose and the justified expectations of Plaintiff.

■ All Wyoming contracts are subject to an implied covenant of good faith and fair dealing. *Scherer Construction, LLC v. Hedquist Construction, Inc.*, 18 P.3d 645, 653 (Wyo.2001). "Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party." *Scherer Construction*, 18 P.3d at 653; Restatement (Second) of Contracts § 205 cmt. a. "A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance." *Scherer Construction*, 18 P.3d at 653; Restatement (Second) of Contracts § 205 cmt. d. "The purpose, intentions, and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties. The covenant of good faith and fair dealing may not,

however, be construed to establish new, independent rights or duties not agreed upon by the parties. In other words, the concept of good faith and fair dealing is not a limitless one. The implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties. In the absence of evidence of self-dealing or breach of community standards of decency, fairness or reasonableness, the exercise of contractual rights alone will not be considered a breach of the covenant." *Scherer Construction*, 18 P.3d at 653–54 (citations omitted).

■ In the present case, Plaintiff attempts to imply that it was the duty of Defendants to drill on every section of land covered by the 1990 Leases so that the Leases would never expire as long as oil or gas was available in the leased lands. Such a provision does not appear in the Leases or other contracts relating thereto, and the Court will not imply such a provision under the duty of good faith and fair dealing. Plaintiff intimates that since Defendant Guthrie has obtained a subsequent right to some of the lands covered in the 1990 Leases and is drilling wells pursuant to that right, there must have been bad faith. Such is not the case. The agreements between the parties were effectuated as drilling did actually take place— evidenced by the fact that Plaintiff does not, and could not, dispute that he continues to receive royalties from nineteen wells that were drilled pursuant to the agreements. An implied duty to not let any of part of the land covered by the 1990 Leases remain undrilled would eviscerate the actual contractual language which only includes a duty to drill one test well. *See* Express Farmout, ¶ II(A) Test Well. The Express Farmout also says that "the only consequence of Farmees' failure to comply with any provisions of this Agreement . . .

shall be the cancellation of this Agreement in its entirety at [Plaintiff's] option." *See* Express Farmout, ¶ III Failure to Drill. Rather than imposing an absolute duty to drill otherwise, the Express Farmout states that Defendants "shall continue to have the right to drill additional wells on the acreage." *See* Express Farmout, ¶ I. This language uses the word "right" as opposed to creating a duty to drill *ad infinitum*. The Court will not contradict the express language of the Agreements by interpreting a duty of good faith and fair dealing on the contracts to mean that Defendants are required to drill on and on, on every portion of land, until all possible minerals are extracted from the land covered by the 1990 Leases.[4] Such an overwhelming duty would unreasonably burden the Defendants with the continued expense of drilling, although they undoubtedly have numerous legitimate reasons to not do so. If such a duty was intended by the Plaintiff, he should have bargained for it in the Agreements.

The Court will not apply the doctrine of good faith and fair dealing in the way in which Plaintiff requests in this situation between these sophisticated parties. The Court cannot contradict the language of the Agreements and imply a duty which would unfairly burden the Defendants with an unending, limitless duty to drill when the only agreed common purpose could be some drilling which would generate income for the Plaintiff, which he does not dispute occurred. Therefore, as no genuine issues of material fact exist, Defendants' Motions for Summary Judgment as to Count Two of Plaintiff's Amended Complaint alleging a duty of good faith and fair dealing are **GRANTED**, and Count Two of Plaintiff's Amended Complaint · is **HEREBY DISMISSED**.

### III. Remaining Claims Against Defendant Guthrie

As the basis for his remaining claims against Defendant Guthrie, Plaintiff asserts that Guthrie participated in a washout transaction in contravention of the extension and renewal clause in the 1992 Assignment, and additionally, that a fiduciary relationship between Plaintiff and Guthrie supports Plaintiff's claim for royalties on wells drilled after the 1990 Leases expired. The Court finds Plaintiff's arguments without merit and that the 1996 Leases were new leases, not extensions or renewals of the 1990 Leases and that no washout took place. Thus, Plaintiff is not entitled to claim that he is owed a royalty on the wells drilled under the 1996 Leases, to which he is not a party. Also, Plaintiff's argument that Guthrie owed him a heightened or fiduciary duty are misplaced as no evidence supports any such finding. Additionally, such a finding under the circumstances of this case would exert an unreasonable constraint on the oil and gas business.

▮ An "extension or renewal clause" is a clause included in an instrument which

---

4. Discussion of a duty of Defendants to reassign land which was not the subject of continuous drilling to Plaintiff has been made. Although the AOG Farmout did include language to this effect (*See* Exhibit B · to Pltf's Amended Complaint, ¶ 8 "any lands not included in a drillsite spacing unit on December 31, 1994 (December 31, 1994, as amended) will be reassigned to Sawyer ..."), the subsequent Express Farmout acknowledged that reassignment had not occurred, that the Farmee was the successor to the interests of the AOG Farmout and thus effectively waived Plaintiff's right to pursue that claim, as the contract stated: "[Plaintiff] hereby acknowledges such reassignment shall not be made ...." *See* Exhibit E to Pltf's Amended Complaint, ¶ I. No contractual duty to reassign the lands which were not being drilled was included in the subsequent Express Farmout as they were in the AOG Farmout, and thus Plaintiff's claim as to a duty to reassign must fail.

creates an overriding royalty or oil payment out of the working interest to protect against a washout. Williams & Meyers, *Manual of Oil and Gas Terms* 431 (8th ed.1991). In effect, the clause provides that the interest shall apply and be a part of all future renewals or extensions of the lease. *Id.* A "washout" is the "elimination of an overriding royalty or other share of the working interest by the surrender of a lease by a sublessee or assignee and subsequent reacquisition of a lease on the same land free of such interest." *Id.* at 1340.

The clause that Plaintiff relies upon for these remaining claims against Defendant Guthrie is contained in the 1992 Assignment between Plaintiff and AOG (Guthrie is the successor in interest of AOG), and reads in applicable part as follows:

> Reserving ... an overriding royalty of five percent (5%) of all the oil, gas and other hydrocarbons produced, saved and marketed from the above described lands. This overriding royalty and all other terms and conditions of this assignment shall apply to any and all extension, renewal and substitute leases obtained by [AOG], its successors or assigns on the land described herein.

*See* Pltf's Mot. for Partial Summ. J., Exhibit C.

### A. 1996 Leases—Extension or Renewal v. New Lease

As basis for his claim that he is entitled to royalties under the 1996 Leases, Plaintiff asserts that the 1996 Leases are merely extensions or renewals of the 1990 Leases, and therefore the above-quoted clause in the 1992 Assignment entitles him to the 5% overriding royalty that he was entitled to under the 1990 Leases. Generally, courts have evaluated these claims on the basis of a definitional approach which applies accepted legal distinctions between the terms extension or renewal and new leases. *See Lillibridge v. Mesa Petroleum Co.,* 907 F.2d 1031, 1037 (10th Cir.1990); *Williams Petroleum Co. v. Midland Cooperatives, Inc.,* 679 F.2d 815, 817 (10th Cir.1982); *Sunac Petroleum Corp. v. Parkes,* 416 S.W.2d 798 802 (Tex. 1967); *Mutual Paper Co. v. Hoague–Sprague Corp.,* 297 Mass. 294, 8 N.E.2d 802, 806 (1937). "Renewal and extension are concepts closely allied to one another, normally involving a continuation of the relationship on essentially the same terms and conditions as the original contract." *Williams Petroleum,* 679 F.2d at 817.

In the present case, the Court finds that the 1996 Leases are not renewals or extensions of the 1990 Leases, but are instead new leases which lacked significant similarity to each other, aside from the obvious fact that they involved a portion of the same lands and Defendant Guthrie.[5] The

**5.** Among the differences in the 1996 Leases and the 1990 Leases were that: 1) the 1996 Leases pertained only to shallow gas, whereas the 1990 Leases included all oil and gas; 2) the 1996 Leases included 3,664.12 acres, whereas the 1990 Leases covered 2,745.13 acres; 3) the land described in the 1996 Leases is more contiguous, particularly in Sections 31–34, T48N, R72W; 4) the landowner royalty was increased to 15% in the 1996 Leases; 5) the primary term was reduced from five years to three years. Shut-in royalties were permitted to hold a spacing unit for only one year instead of three years as they were in the 1990 Leases, and under the 1996 Leases, the spacing unit would expire at the end of the one year shut-in period; 6) the 1990 Leases included a one year extension if any part of the land was held by production, whereas the 1996 Leases contained no extension. The 1990 Leases had a 180–day continuous drilling clause; the new leases had a 60–day continuous drilling clause; 7) the 1990 Leases had no minimum well requirement during the primary term, whereas the 1996 Leases required a minimum of seven wells per year in the primary term; 8) the 1990 Leases contained normal pooling consents, whereas the 1996 Leases contained rigid requirements including the duty to drill out unitized land. Compare Exhibits A and F, Def. Guthrie's Mem. Re: Motions for Summ. J.

Court also finds it significant to this analysis that the 1990 Leases had expired according to their own terms over two and a half months before the 1996 Leases were executed. Also, it is apparent to the Court that the Stuarts and the Lynde Trust have a pattern and practice of leasing the lands in their control for the purpose of mineral exploration, and thus, the re-leasing of the lands for that purpose is not in any way remarkable. Nor is it remarkable that Defendant Guthrie took the 1996 Leases from Overstreet, as he appears to have made a career of land exploration and his actions under the circumstances in question in the case at bar were merely in the regular course of his business. Therefore, as there are no disputed issues of material fact as to whether the 1996 Leases were extensions or renewals of the 1990 Leases, Defendant Guthrie's Motion for Summary Judgment is **GRANTED**, and Plaintiff's claims that he is entitled to a five percent royalty on the wells drilled under the 1996 Leases are **DISMISSED**.

### B. Fiduciary Relationship

In addition to the argument made by Plaintiff that the 1996 Leases were an extension or renewal of the 1990 Leases and thus entitled him to collect the five percent overriding royalty on wells drilled under the 1996 Leases which the Court has rejected, Plaintiff claims that the inclusion of an extension or renewal clause in the 1992 Assignment created a heightened or fiduciary duty on Guthrie's part to preserve the Plaintiff's overriding royalty, especially since the royalty was the only consideration that Plaintiff received in exchange for the 1992 assignment. The Court also finds this argument to be without merit.

*Long v. Great West Life & Annuity Insurance Co.*, 957 P.2d 823, 829 (Wyo. 1998) defined a fiduciary as "[a] person having duty, created by his own undertaking, to act primarily for another's benefit in matters connected with such undertaking." *Martinez v. Associates Financial Services Co. of Colorado, Inc.*, 891 P.2d 785, 790 (Wyo.1995). In describing fiduciary relationships, the Wyoming Supreme Court has said: "Of the two essential kinds of fiduciary relationships, the first arises from specific legal relationships. In cases of trustee and beneficiary, principal and agent, and the like, the relations are essentially fiduciary, and the inference or presumption follows of course .... The second is less susceptible of exact definition, being implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions." *Long*, 957 P.2d at 829. The case at bar involves neither situation.

As stated above, this Court, sitting in diversity, "must ascertain and apply state law to reach the result the Wyoming Supreme Court would reach if faced with the same question." *Carden v. Kelly*, 175 F.Supp.2d 1318, 1322 (D.Wyo.2001). However, Plaintiff has not cited any Wyoming Supreme Court decision which holds that by merely including a clause in a contract, some type of fiduciary relationship or heightened duty is created. A majority of the cases which Plaintiff relies upon for this principal are non-binding precedent for this Court as they are based upon the law of other states, such as Oklahoma or Kansas. *See* Pltf's Mot. for Partial Summ. J. pp. 19–20, citing *Rees v. Briscoe*, 315 P.2d 758 (Okla.1957); *Campbell v. Nako Corporation*, 195 Kan. 66, 402 P.2d 771 (1965); *Independent Gas & Oil Producers, Inc. v. Union Oil Co. of California*, 669 F.2d 624, 627 (10th Cir.1982)(applying Oklahoma law); *Reynolds–Rexwinkle Oil, Inc. v. Petex, Inc.*, 268 Kan. 840, 1 P.3d 909 (2000).

Plaintiff primarily relies on *Lonabaugh v. Midwest Refining Co.*, 285 F. 63

(D.Wyo.1922) for the proposition that the inclusion of the extension or renewal clause in the 1992 Assignment was enough to create a heightened or fiduciary duty on Defendant Guthrie. *Lonabaugh*, written in 1922 by District Judge Kennedy, was before the Court on a Motion to Dismiss, which the Court overruled and denied. The *Lonabaugh* case is bereft of any case law upon which it rests its finding, and is penned as it were in language which causes the reader to doubt the Court's certainty in its statement, such as follows: *"There also seems to have been* a fiduciary relationship existing between the defendant and plaintiff, which the defendant assumed by taking over the original lease under assignment, and which interest of plaintiff therein the defendant subsequently recognized by paying over to plaintiff portions accruing from operations under the lease." *Id.* at 65 (emphasis added). As *Lonabaugh* was before the court on a motion to dismiss, the court merely accepted the allegations of the Plaintiff as true[6] under the precursor to the familiar Fed. R.Civ.P. 12(b)(6) standard of today. *See Detroit United Railroad Co. v. City of Detroit*, 248 U.S. 429, 431–32, 39 S.Ct. 151, 63 L.Ed. 341 (1919)(in case where court dismissed bill on its own motion, case must be considered on the allegations of the bill as if on demurrer, and therefore, the allegations of the bill must be regarded as true). As the *Lonabaugh* Court gave no explanation for its reasoning behind finding a fiduciary relationship, and procedurally merely accepted the claim that such a relationship existed, the Court finds that it is not persuasive to the circumstances and documents in the case at bar.

Additionally, sixteen years later, Judge Kennedy, who also wrote *Lonabaugh*, rejected a plaintiff's invitation to find a fiduciary relationship through his reliance on *Lonabaugh*, saying: "Plaintiffs' counsel seems to express a hope that this Court may perhaps be interested in becoming the pioneer in converting the ordinary gas and oil lease contract into a trust relationship, if it does not already exist. This Court, however, being doubtful of its soundness, has no desire to enter upon an ambitious program along the line suggested." *Cooper v. Ohio Oil Co.*, 25 F.Supp. 304, 309 (D.Wyo.1938). Judge Kennedy went on to explain that the circumstances in *Cooper* did not warrant finding a fiduciary relationship even though there were egregious allegations of wrongdoing (and certainly more egregious circumstances than are alleged in the case at bar) which would seem to necessitate the imposition of protective duties on the parties. Instead, the *Cooper* court accepted findings of many other state and Federal courts:

> There is no relation of special trust or confidence between the lessor and lessee in a gas or oil lease any more than in any other. Like all other contracting parties, they deal at arm's length, each for his own interest. The mere act of making the contract does not constitute proof of a fiduciary relation.

*Id.* Just as Judge Kennedy rejected the existence of a fiduciary relationship and said that the circumstances differed from those in *Lonabaugh*, the Court in the present case will not find a fiduciary relationship or any sort of heightened duty on Defendant Guthrie's part based on the extension or renewal clause in the 1992 Assignment. Under the circumstances of this case, the Court will not enforce such a duty on Defendant Guthrie to protect the interests of Plaintiff, a sophisticated former stock broker, who had experience dealing in the oil and gas industry. This is not to say that there would never be a

---

**6.** "The chief contention of counsel of plaintiff is that the circumstances established by the instruments set forth a fiduciary relationship ...." *Lonabaugh*, 285 F. at 65.

time where a fiduciary relationship could have been created[7], but in the present case, the inclusion of boiler plate language in a document negotiated at arms' length between virtual strangers is not such a situation.

Plaintiff also relies on *McDermott v. Blackner*, 84 F.Supp. 578 (D.Wyo.1948), where the Court found a fiduciary relationship between the plaintiff and defendant. However, the court found this heightened duty based upon the prior dealings between the parties relating to the same land during which they "became partners or coadventurers in development of the land for their mutual benefit." *Id.* at 581. The *McDermott* court found that regardless of whether the subsequent lease was an extension or renewal of the old lease versus a completely new and separate lease, Plaintiff was entitled to enforce his rights as the "rights of the plaintiff are vested in an equitable situation by virtue of a fiduciary relationship between plaintiff and defendant." *Id.* Such is not the case between Plaintiff and Guthrie, as they merely entered into a contract, an arms length deal by definition, and no relationship of coadventurers previously existed, and therefore, this Court will not impose such a finding, as the present situation was very different than the one at issue in *McDermott*.

All parties to the current action are experienced in the oil and gas business, and the Court will not take pity on an experienced, albeit partially unsuccessful oil and gas investor (*See* Exhibit L to Defendant Guthrie's Memorandum in Support of Summ. J., Plaintiff's answers to Interrogatories) who failed to pursue and enforce his rights under the 1990 Leases and various subsequent agreements by let-

ting them expire and now wishes, years later, to have this Court do his bidding, thereby making law which could hinder the free enterprise in the oil and gas industry in Wyoming. The Court finds the language in a Tenth Circuit opinion which rejected finding a fiduciary relationship between the holders of an overriding royalty interest in an earlier lease and the holder of a working interest under the lease illustrative: "the result appellants advocate would effectively prohibit a working-interest owner from acquiring a new lease if there was an outstanding overriding royalty interest in renewals or extensions of the existing lease. We will not create such an irrational impediment to the business of oil exploration and development." *Lillibridge v. Mesa Petroleum Co.*, 907 F.2d 1031, 1036 (10th Cir.1990).

As no genuine issues of material fact remain, Defendant Guthrie's Motion for Summary Judgment as to Plaintiff's claims based upon the extension or renewal clause and alleged fiduciary or heightened duties as a result thereof is **GRANTED** and Plaintiff's Third Claim for Relief is **DISMISSED**.

### Conclusion

For all of the aforementioned reasons, Defendants' Motions for Summary Judgment are **GRANTED** and Plaintiff's First, Second and Third Claims for Relief are **HEREBY DISMISSED WITH PREJUDICE**. As the resolution of the above issues in favor of Defendants specifically on the merits of Plaintiff's case negate Plaintiff's remaining claims based thereon, Plaintiff's Fourth through Ninth Claims are also **DISMISSED WITH PREJUDICE**. Plaintiff's Motion for Partial Sum-

---

7. *See Reynolds–Rexwinkle Oil, Inc. v. Petex, Inc.*, 268 Kan. 840, 1 P.3d 909 (2000) (collecting cases and secondary sources which embrace or advocate on a policy basis for imposing a fiduciary relationship in circumstances somewhat similar to those in the present case).

mary Judgment is also **DENIED**. As the Court has been able to determine the merits of Plaintiff's case as a matter of law in relation to the above-stated Defendants' Motions for Summary Judgment, the Court will not, and need not consider Defendants' later filed Motion by Defendants Mission Resources, Torch Acquisition Co., Torch Energy Advisor, and Express Acquisition for Summary Judgment based on the Doctrine of Laches, and Motion by Defendant Guthrie for Summary Judgment based upon Statute of Limitations, Laches, Statute of Frauds and Rule Against Perpetuities, and they are thus **DENIED AS MOOT**. As the Court did not find it necessary to rely on Defendant Guthrie's affidavit, Plaintiff's Motion to Strike Guthrie Affidavit is deemed **MOOT**.